737 A.2d 557

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

T. Clarence HARPER and Versteal Kemp.

Misc. AG No. 1, Sept. Term, 1998.

Court of Appeals of Maryland.

Sept. 15, 1999.

54

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel for the Attorney Grievance Com'n of Maryland, for petitioner.

Joseph L. Gibson, Jr., Riverdale, Othello G. Jones, Jr., Washington, DC, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

The principal charges in these jointly tried attorney discipline cases allege violations of Rule 5.5 (Unauthorized practice of law) of the Maryland Lawyers' Rules of Professional Conduct.[1] The violations concern a law office that operated in Baltimore City under the firm name, "Harper & Kemp," from May 1995 until sometime in 1997.

One of the respondents, T. Clarence Harper (Harper), is an attorney who is licensed to practice in the District of Columbia. Throughout the relevant period Harper maintained an office on Georgia Avenue in the District of Columbia. His practice primarily has consisted of representing claimants in personal injury cases. The other respondent, Versteal Kemp (Kemp), is an attorney who has been licensed to practice in Maryland since 1974. For some portion of the relevant period Kemp maintained an office on Auth Place in Prince George's County and later opened an office on Kenilworth Avenue in that county. His practice has been more general than that of Harper and has tended to concentrate in criminal defense work.[2]

---

1. Rule 5.5 provides:
 "A lawyer shall not:
 "(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or
 "(b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."

2. Harper and Kemp are each admitted to practice before the United States District Court for the District of Maryland, but that authorization is not involved in the issues in this case.

## I

The origins of Harper & Kemp trace back to two former Maryland attorneys who practiced in Baltimore City and who were disbarred by this Court, Fred Kolodner, *see Attorney Grievance Comm'n v. Kolodner*, 321 Md. 545, 583 A.2d 724 (1991), and Burton M. Greenstein.[3] Fred Kolodner's wife, Deborah Kolodner, was a principal in Industrial Medical Center, an enterprise which provided physical therapy and treatment facilities for automobile accident and workers' compensation claimants. After Fred Kolodner's 1991 disbarment, Greenstein, at least ostensibly, assumed Fred Kolodner's practice. Fred Kolodner worked in Greenstein's office, as did one Joseph Mitchell Somerville, also known as Al Mitchell (Mitchell). Mitchell testified that he had been a runner for Fred Kolodner, for which service he had been paid $200 to $600 a case by Deborah Kolodner. When the volume of cases was such that Fred Kolodner could not handle it, Mitchell worked in Kolodner's office, and later in Greenstein's office. He obtained and organized the documentation, principally in support of damages, that was needed to settle the cases with insurers. At some point prior to early 1995 federal law enforcement officers seized personal injury case files from Greenstein's office and stored them at a post office in Columbia, Maryland. It seems to be acknowledged by all of the parties in the instant matter that Deborah Kolodner, in some fashion that is not explained, controlled, or considered that she controlled, the cases that had been handled in Greenstein's office.

Harper & Kemp arose out of discussions between Deborah Kolodner and Harper in early 1995. The understanding was that Deborah Kolodner would refer the clients or files of Greenstein/Industrial Medical to Harper who would undertake to settle the cases. Harper thereafter discussed this arrange-

---

**3.** Burton M. Greenstein was disbarred by an unreported consent order dated December 15, 1995, in *Attorney Grievance Commission v. Greenstein*, 341 Md. 29, 668 A.2d 421 (1995).

ment with Kemp, which resulted in the opening of the Harper & Kemp office at 1010 St. Paul Street in Baltimore City.

There never was any written agreement between the two respondents as to the financial aspects of Harper & Kemp. At the hearing in this matter they disagreed as to whether any oral agreement ever had been reached. Harper testified that there was an oral arrangement under which each respondent would contribute thirty percent of the fees collected on work generated by that attorney into the office's operating account in order to pay expenses, and that the producer would keep the balance of the fee generated by him. The matter was to be revisited if that initial level of contribution to expenses became insufficient. Kemp, on the other hand, testified that no agreement had been reached and, indeed, that he was annoyed over Harper's having "had his name first on the door." Further, Kemp wanted a written agreement which provided that he would receive some percentage of the fees on cases that Harper brought in. Kemp tacitly acknowledges that the Greenstein files, as between the two respondents, were cases generated by Harper.[4]

Harper established escrow and operating accounts on which both he and Kemp were authorized signators. The checks for those accounts are respectively imprinted "Harper & Kemp, Attorneys at Law—Escrow Account" and "Harper & Kemp, Attorneys at Law—Operating Account" with the St. Paul Street address and the telephone number of that office. Harper signed a one-year lease for the office that expired in May 1996; thereafter, the tenancy was month to month. There was also legal stationery headed "Harper & Kemp." Behind Harper's name a symbol referred the reader to the statement, "Member of D.C., and Maryland Federal Bars." Behind Kemp's name a different symbol referred the reader to the statement, "Member of Maryland State and Federal Bars."

---

4. According to Mitchell, ninety-nine percent of the Greenstein files were generated by runners. Harper & Kemp, however, did not use runners.

Harper & Kemp, through Harper, hired Mitchell. Harper told an investigator for Bar Counsel that this had been done on the recommendation of Deborah Kolodner.[5] Mitchell's principal duties were to put in order and make current the Greenstein files, a responsibility that required him frequently to travel to the post office in Columbia.

In its physical layout the Harper & Kemp suite was a former physician's office, with a waiting room, glass-enclosed receptionist area, a small office used by Mitchell and at times by Kemp, and a large office used by Harper. According to Harper, for the first nine months of operation the respondents alternated in covering the office. Thereafter, Kemp stopped coming to the office on this schedule, although he still retained keys to it and, when the locks were changed, he received keys which gave him access through the front door and to the small office. After Kemp stopped coming to the office, he did not change his address from 1010 St. Paul Street. Individual pieces of mail of a quantity sufficient to fill two large manila envelopes and postmarked between June 1995 and January 1997 were addressed to Kemp at 1010 St. Paul Street but had not been seen by him prior to trial.

Between May 1995 and September 1996 Harper drew fifty-five checks, totaling $110,353.93, on the escrow account that were payable to clients as distributions of settlement proceeds. He also drew checks on the escrow account totaling $82,241.97 of which six were payable to cash and the others payable to Harper personally or to Harper & Kemp. The total of deposits to the operating account is not in the record. Kemp never contributed to expenses, and he made no deposits to or withdrawals from the operating account.

---

**5.** The person whom we call "Mitchell" is actually Joseph Somerville. Mitchell testified that, at the suggestion of Deborah Kolodner, he had used the name Mitchell when hired by Harper & Kemp because a considerable amount of publicity had surrounded his true name due to his connection with yet another attorney who had been disbarred. Mitchell further testified that Deborah Kolodner told Harper Mitchell's true name when she and Harper had a falling out a week or two after the Harper & Kemp office had opened.

Harper signed the retainer agreements between Harper & Kemp and the personal injury clients. When Harper was interviewed by Bar Counsel's investigator at the St. Paul Street office, Harper said that the files that were piled around the office were his and not Kemp's. Kemp testified that he had seen the files piled up in Harper's office but that he did not work on any of the cases. Without objection from Harper, Bar Counsel's investigator testified that Kemp told him in April 1997 that Kemp "had nothing to do with the files up in Baltimore" and that Harper "had been the person who had dealt with all of the clients up there." In the late spring or early summer of 1996 Kemp arranged to share office space with another attorney. Prior to putting those arrangements into effect Kemp said that he had spent a good deal of time in Georgia while his mother was dying of cancer.

Mitchell worked at Harper & Kemp for a little less than one year, from June or July of 1995 to May of 1996. During that time he said that he worked daily with Harper, but saw little of Kemp who had a practice elsewhere and who occasionally came into the office in the evening and left notes for Mitchell concerning Kemp's cases.

Harper testified that he closed the Baltimore office sometime in 1997.

## II

The petition for disciplinary action against the respondents resulted from complaints to Bar Counsel by certain Harper & Kemp clients. In addition to charging a violation of Rule 5.5 by Harper, the petition also charges that Harper violated Maryland Code (1989, 1995 Repl.Vol.), § 10–601 of the Business Occupations and Professions Article (BOP). That statute in relevant part provides:

"(a) *In general.*—Except as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar.

. . . .

"(c) *No defense to act through lawyer.*—It is not a defense to a charge of a violation of this section that the defendant acted through [a] ... partner ... who is a lawyer."

BOP § 10–606(a)(3) makes violation of § 10–601 a misdemeanor. These two statutes form the basis for additionally charging Harper with violating Rule 8.4(b) and (d). Respectively these sections provide that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects" and to "engage in conduct that is prejudicial to the administration of justice."

With respect to Kemp, the general arrangement between the respondents is the basis for charging Kemp with a violation of Rule 5.3, in addition to the charge under Rule 5.5(b) (assisting in the unauthorized practice of law). Rule 5.3 in general deals with "Responsibilities regarding nonlawyer assistants," and is set forth in full in the margin.[6]

Bar Counsel's legal theory of the unauthorized practice aspects of this case is that the lawyer who is admitted in another jurisdiction, but who is not admitted in Maryland, may not practice law in Maryland in partnership with a Maryland

---

**6.** Rule 5.3 reads:

"With respect to a nonlawyer employed or retained by or associated with a lawyer:

"(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

"(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

"(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

"(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

"(2) the lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

attorney, out of an office maintained by the partnership in Maryland, unless the Maryland attorney supervises the work of the unadmitted lawyer. Because both respondents accept this legal analysis, we have no occasion in this matter to explore the theory further.

The petition for disciplinary action also alleges other violations arising out of the legal representation of specific clients. In each of these instances Bar Counsel again alleges Harper's unauthorized practice of law and Kemp's assistance in that unauthorized practice. We shall review the client-specific charges in Parts V and VI hereof.

On referral from this Court, the petition against these respondents was heard by Judge Arthur M. Monty Ahalt of the Circuit Court for Prince George's County. In his report submitted to us, Judge Ahalt found that the respondents committed each of the violations charged in the petition, with three exceptions that are relevant to our review. First, the report is silent with respect to the charge against Harper of violating Rule 5.5(a). That omission is immaterial inasmuch as Judge Ahalt found that Harper violated BOP § 10–601 and Rule 8.4(b) and (d). Second, Bar Counsel had charged that the six checks drawn by Harper on the escrow account that were payable to cash violated Maryland Rule 16–609. That rule in relevant part provides that "[a]n instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer." Both respondents were charged with those violations, but the report does not mention them. Third, Bar Counsel also excepted to the absence of any decision concerning certain letters in one of the client-specific matters that were charged as misleading.

Harper's written exceptions to Judge Ahalt's findings are silent on the principal issue of unauthorized practice. His exceptions challenge only the sufficiency of the evidence to support two of the client-specific charges. At oral argument in this Court Harper addressed the larger picture. He then contended that he was supervised by Kemp and, therefore, was not engaged in the unauthorized practice of law.

Kemp's exceptions to the findings are more fundamental. He challenges the finding that the respondents, in early 1995, when they met at a restaurant in Washington, D.C., "formed a partnership for the practice of law. . . ." Kemp submits that the respondents' arrangement was simply a sharing of space, that he had no obligation to supervise Harper's practice, and that all charges against him should be dismissed.

### III

In an exercise of discretion we shall treat Harper's oral argument in this Court, directed to the finding of unauthorized practice, as an amendment to his written exceptions.

Arguing within the framework of the legal premise on which this case was tried, Harper submits that he was sufficiently supervised by Kemp. Harper argues that the degree of supervision required to avoid violating BOP § 10–601 is inversely proportional to the knowledge and experience of the unadmitted attorney in the field of practice in which that attorney is engaged. Here, Harper points to his experience in the plaintiffs' personal injury field in the District of Columbia which, he submits, makes his conduct the authorized practice of law. This contention is answered by Judge Ahalt's categorical finding that "Kemp never supervised Harper's or Mitchell's practice of law." That finding is fully supported by the evidence reviewed in Part I. Consequently, Harper's argument is reduced to defending the proposition that no supervision is required.

That argument places an absurd construction on BOP § 10–601. Under that argument an unadmitted attorney may maintain an office for the practice of law in Maryland, and may counsel and represent Maryland residents on legal matters involving the application of Maryland law, simply by arranging to use the name of an admitted attorney in the ostensible firm name of the unadmitted attorney's practice.

### IV

The position taken by Kemp in his exceptions to the charge of assisting in unauthorized practice is the antithesis of Har-

per's argument. Kemp contends that he had no professional obligation to concern himself with supervising Harper's practice because the respondents had never effected the contemplated partnership agreement. Kemp sees the relationship between the respondents to have been that of two lawyers who were merely sharing office space in the same suite. Thus, submits Kemp, Judge Ahalt's findings that Kemp failed to supervise Harper are immaterial.

■ Kemp's argument totally misses the point. Insofar as Kemp's misconduct is concerned, whether the respondents, as between themselves, were partners is not determinative of whether Kemp assisted Harper's unauthorized practice. Kemp furnished his name to the enterprise. It was used on the office suite, on the stationery, and on the checks. From the standpoint of the public Kemp was Harper's partner. Kemp assisted Harper in presenting himself to the public as a lawyer who was lawfully offering his legal services to all comers out of the office at 1010 St. Paul Street. There is no evidence that Kemp ever sought to have his name removed from the law practice, even after, under Kemp's theory, the respondents were unable to agree on the terms of a written partnership agreement and even after Kemp ceased using the office.

## V

We now turn to the specific exceptions of Bar Counsel.

### A. Bar Counsel's Complaint
### (Rule 16–609)

Bar Counsel excepts to Judge Ahalt's failure to address in any way the charge that six checks were drawn by Harper against the Harper & Kemp escrow account and made payable to cash, thereby violating Maryland Rule 16–609. Bar Counsel argues as to Kemp that, because it was admitted that Kemp was also a signatory of the account, Kemp was "also accountable directly for the proper administration of that account."

■ Harper testified that he had inadvertently paid funds to or for clients from the operating fund when he had intended to draw the funds from the escrow account. The mistakes were found when the bank notified Harper that there were insufficient funds in the operating account. He then found the errors and reimbursed himself from the clients' funds in the escrow account. It is immaterial that Judge Ahalt made no specific finding concerning this explanation.[7] Harper's explanation is uncontradicted, but it is directed to whether there was a misuse, or misappropriation, of escrow funds. The violation of Rule 16–609, however, consists in drawing the checks on the escrow account made payable to "cash." The purpose of the requirement in Rule 16–609 is to enable one who is authorized to do so to trace the disposition of escrow funds. Nothing prevented Harper from making the checks payable to himself, or to the firm, rather than to cash. After making an entry in the escrow records to explain that the purpose of the checks was to offset an overpayment from the operating fund, Harper then could have deposited the funds in the operating account or cashed the checks.

■ Bar Counsel's exception is sustained as to Harper.

■ With respect to Kemp, there is no evidence that he knew that any of the escrow checks were drawn by Harper to cash. The incidents with the checks are simply further evidence of Kemp's assisting in the unauthorized practice of law by Harper, through indifference to the way in which the name, Kemp, was being used. Bar Counsel's exception as to Kemp is denied.

### B. Foster/Anderson Complaint
### (BC Docket No. 96–256–00–6)

Judge Ahalt made the following finding:

---

**7.** Harper did not introduce any evidence giving the specifics as to any of the incidents.

"Harper solicited the representation of Brenda Foster on behalf of her minor child, Linnea Monique Anderson, for a personal injury case. Kemp did not supervise Harper's actions."

Three letters sent by Harper regarding Brenda Foster and her daughter, Linnea Anderson, were entered into evidence. The first letter is dated April 21, 1995, and includes the typed-out letterhead "Harper* & Kemp." The asterisk next to Harper's name refers to the right margin where "T. Clarence Harper, Licensed in D.C." was written. No mention of Kemp is made. The body of the letter reads:

"Dear Ms. Anderson:

"Please call to make an appointment to see me to complete [PIP] forms and to discuss settlement of your case. Thank you.

"/s/ T. Clarence Harper, Esquire."

The second letter, dated April 25, 1995, has the same typed-out letterhead as the first letter and similarly refers to Harper as "Licensed in D.C." This letter is signed by Vera Jacques, Harper's secretary, and reads:

"DEAR CLIENT:

"UPON RECEIPT OF THIS LETTER PLEASE CALL ME IN REGARDS TO YOUR SETTLEMENT MONIES. AWAITING YOUR CALL[.]"

The third letter is dated June 9, 1995, and is written by Harper to attorney Bruce Ezrine, who by then represented Linnea Anderson. The letter was written on the regular Harper & Kemp stationary described in Part I hereof and reads:

"Re: Linnea Anderson, by her Mother And Next Friend Brenda Foster

"Dear Mr. Ezrine:

"I tried to reach you by phone regarding your above named client. I apologize for not responding to her previous letter to us regarding her file. In fact, we do not have her file.

"We have spoken with several people who expressed dissatisfaction with the representation of Atty. Burton Greenstein. They retained us and gave us names of other peoples who they believed were also dissatisfied with Mr. Greenstein.

"We sent letters to those persons inviting them to call us regarding their case. The use by us of the word 'settlement' was erroneous, misleading and, suggested that we had their files. Those erroneous letters have been corrected.

"Your client's file, as well as those of many of the clients we are representing, are either with Mr. Greenstein or the Postal Authorities who took them from Mr. Greenstein's office. ...

"Since we were never retained by your client, we never requested her file from Mr. Greenstein. If there are any questions, let me know.

"/s/ T. Clarence Harper"

 Bar Counsel excepts to Judge Ahalt's failure to find that Harper's conduct violated Rules of Professional Conduct 7.1(a) and (b) and 7.5(a) and (b).[8] With regard to Rule 7.5 Bar

---

**8.** Rule 7.1 provides in relevant part:

"A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

"(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading; [or]

"(b) is likely to create an unjustified expectation about the results the lawyer can achieve, or states or implies that the lawyer can achieve results by means that violate the rules of professional conduct or other law[.]"

Rule 7.5 provides in relevant part:

"(a) A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1. A trade name may be used by a lawyer in private practice if it does not imply a connection with a government agency or with a public or charitable legal services organization and is not otherwise in violation of Rule 7.1.

"(b) A law firm with offices in more than one jurisdiction may use the same name in each jurisdiction, but identification of the lawyers in an office of the firm shall indicate the jurisdictional limitations on

Counsel points out that the letterhead of the first and second letters does not identify Kemp and identifies Harper as being "Licensed in D.C.," thereby, argues Bar Counsel, creating the false impression that, in addition to being licensed in D.C., Harper is licensed in Maryland. The submission is that this conduct constitutes an impermissible holding out that Harper is lawfully engaging in the practice of law in Maryland from a principal office in Maryland. With regard to Rule 7.1 Bar Counsel contends that the first letter was additionally materially misleading by implying that Harper had Anderson's file and could settle her claim.

We agree with this analysis. Bar Counsel's exceptions are sustained.

VI

In this Part VI we address the remainder of the exceptions by Harper.

**A. Frances Bonner Complaint**
**(BC Docket No. 96–480–00–6)**

█ Judge Ahalt made the following finding:

"T. Clarence Harper undertook the representation of Frances M. Bonner in a personal injury case. Her case was settled without her authorization. Kemp did not supervise Harper's actions."

Frances Bonner (Bonner) was injured in an automobile accident in Baltimore City on September 16, 1995, while a passenger in her son's car. She contacted Mitchell, whom her son knew from a previous accident, and met with him about a week after the accident for the purpose of retaining Harper as her attorney to make a claim against her son. Bonner executed a retainer agreement with Harper.

In February 1996, Bonner released her claim for a gross amount of $4,200, with a net to her of $2,262.88 after attor-

those not licensed to practice in the jurisdiction where the office is located."

ney's fee and other deductions. The copy of the accounting, obtained by Bar Counsel from Harper's records, bears Bonner's signature and is signed by or in the name of Harper.

About two months later Bonner complained to Bar Counsel about having dealt only with Mitchell instead of with Harper and about her failure to obtain a copy of the accounting.

Before Judge Ahalt, Bonner testified in part as follows:

"Q. Okay. Would you explain to the Court—first of all, before the case settled, did you have any discussions with either Mr. Harper or Mr. Kemp about the amounts of the proposed settlement that was being offered by Allstate or the insurance company or by anyone?

"A. No.

"Q. When was the first time you were made aware of the fact that there was a settlement?

"A. Mr. Mitchell called me and said that the case had been settled, I am on my way to Millersville to pick up the checks, and I will be to your house, you know, at a certain time. I said, how far is Millersville. He said, it's right close to your house, so be ready, and we can take the checks, and get them cashed."

Bonner also testified that she was not told that she had the option of rejecting the settlement prior to signing the accounting and release.

Harper's exception argues that Bonner's evidence was insufficient to sustain a finding by clear and convincing evidence. We have carefully reviewed the record and note that Harper's argument in part rests on taking testimony by Bonner out of context. A credibility issue was presented to Judge Ahalt that he resolved with the support of sufficient evidence. Harper's exception is denied.

### B. Kimberly Bonner Complaint
### (BC Docket No. 96–507–4–6)

The legal representation involved in this complaint arose out of an injury suffered by Kimberly Bonner, the daughter of the

same Frances Bonner whose complaint was reviewed above. Bar Counsel charged that Harper had failed to "act with reasonable diligence and promptness in representing a client," in violation of Rule 1.3, and that Harper had failed to keep this client reasonably informed about the status of the subject matter of the representation, in violation of Rule 1.4. Judge Ahalt's report is silent with respect to these alleged violations. Bar Counsel excepted, and what Harper has labeled as his second exception is really a response to Bar Counsel's exception. Resolution of the issue requires interpretation of the testimony of Frances Bonner, credibility judgments, and the drawing of inferences from primary facts. We cannot do this where there are conflicting inferences. Further, because there are more serious violations that have been established, we see no point in remanding to Judge Ahalt for findings on those charges.

## VII

■ We now consider the appropriate sanction. Harper's violation of Rule 5.5(a) was deliberate and persistent. He set up an office for the general practice of law in Baltimore City in order to wring whatever value he could out of the inventory of pending cases of a disbarred lawyer who had practiced in Baltimore City. There is no reasonable basis on which Harper could have thought that his conduct was lawful. His motive in creating Harper & Kemp was greed. There is no mitigation. Other unadmitted attorneys must be deterred from attempting to practice law in violation of the statutory prohibition against unauthorized practice. Harper is disbarred.[9]

■ We view Kemp's role in the scheme to have been to furnish cover for Harper's unauthorized practice. Harper

---

9. " 'Disbarment' when applied to an attorney not admitted by the Court of Appeals to practice law means permanent exclusion from exercising in any manner the privilege of practicing law in this State." Maryland Rules of Practice and Procedure, Title 16, Chapter 700, "Discipline and Inactive Status of Attorneys," Rule 16–701(g).

needed an office in Baltimore City in order to retain the "inherited" client base, and needed to be able to correspond with insurance adjusters, and possibly Maryland attorneys, in converting the inherited claims into cash. Kemp was quite willing to participate in the scheme when he anticipated sharing in the fees from the inherited cases, but lost interest when he was frozen out of the personal injury practice by Harper. Nevertheless, Kemp never took any steps to disassociate his name from the unauthorized practice.

Discipline previously has been imposed on Kemp for professional misconduct. *Attorney Grievance Comm'n v. Kemp*, 303 Md. 664, 496 A.2d 672 (1985). In association with another attorney, Kemp charged an excessive fee and commingled the client's recovery in his personal account. Kemp was reprimanded. *Id.* at 681, 496 A.2d at 680.

In the instant matter Kemp could not reasonably have believed that lending his name to the scheme would convert Harper's general practice of law in Baltimore City into an authorized practice. Just as unadmitted attorneys must be deterred from unauthorized practice, admitted attorneys must be deterred from assisting unauthorized practice. We are also mindful, however, that we imposed a ninety day suspension in *Attorney Grievance Commission v. Brennan*, 350 Md. 489, 714 A.2d 157 (1998), where the respondent had assisted a suspended attorney in the unauthorized practice of law.

Under all of the circumstances we suspend Kemp for three years, effective thirty days from the date of the filing of this opinion. During that thirty day period Kemp shall wind up his law practice in the manner reasonably directed by Bar Counsel.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION**

OF MARYLAND AGAINST T. CLARENCE HARPER
AND VERSTEAL KEMP.