737 A.2d 567

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Bridgette HARRIS–SMITH.

Misc. AG, No. 8, Sept. Term, 1998.

Court of Appeals of Maryland.

Sept. 21, 1999.

Melvin Hirshman, Bar Counsel and Delores O. Ridgell, Asst. Bar Counsel, for Attorney Grievance Com'n of Maryland, Petitioner.

Thomas D. Murphy, Rockville, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

This professional discipline matter involves, among other charges, the unauthorized practice of law. The respondent maintained a principal office for the practice of law for approximately three years in Landover, Maryland without ever having been admitted in Maryland. The defense rests on the respondent's admission to practice during that time before the United States District Court for the District of Maryland (the Maryland District) and on our decision in *Kennedy v. Bar Association of Montgomery County*, 316 Md. 646, 561 A.2d 200 (1989).

The respondent is Bridgette Harris–Smith (Smith).[1] She was admitted to the bar in Pennsylvania in 1986, in the District of Columbia in 1988, and in Virginia in 1991. Throughout the period relevant to this matter she also has been admitted to the bar of the Maryland District. She has never been admitted to the bar of this Court. Throughout her professional career Smith has limited the matters that she undertook to handle to conclusion exclusively to bankruptcy law. From approximately 1987 to September 1993 she was employed by a Maryland attorney, Benny Brooks, at an office in Suite 260, 8201 Corporate Drive, Landover, Maryland.[2] In the fall of 1993 Smith and three other attorneys, two of whom were admitted in Maryland, formed the firm of Craig, Harris, Henderson & Johnson, LLC (the Law Firm).[3] The Law Firm

---

1. Although the papers filed in this case identify the respondent as Bridgette Harris–Smith, the respondent, when called as a witness, identified herself as Bridgette Miriam Smith. Consequently, we shall not use the hyphenated name.

2. None of the charges in the instant matter involve the period when Smith was employed by Benny Brooks. In the last two years of her employment by Brooks, Smith operated primarily out of an office in Virginia.

3. The Harris in the Law Firm's name refers to Smith.

had offices in Suite 770 of the building at 8201 Corporate Drive, Landover. When Bar Counsel's investigation of the complaints in this matter began in 1995, the Law Firm dissolved, and Smith moved her office to Washington, D.C. where her practice thereafter has had its primary focus.

The charges in the instant matter are based upon the complaints of four clients who were represented by Smith during the Law Firm period of her career and on the complaint of Bar Counsel who alleges unauthorized practice. When the complaints went to charges, this Court referred them for hearing to Judge Nelson W. Rupp, Jr. of the Circuit Court for Montgomery County. Judge Rupp found, with respect to each of the complaints, that Smith had violated some, but not all, of the Maryland Lawyers' Rules of Professional Conduct that had been charged.[4] Both Smith and Bar Counsel have filed exceptions. We shall first address exceptions concerning the charge of unauthorized practice of law and then consider the individual client complaints. In each instance we shall state additional facts necessary to present the issues.

## I

To attract bankruptcy and other work, the Law Firm adopted a marketing strategy involving radio and newspaper

---

4. All references to a rule or rules are to the Maryland Lawyers' Rules of Professional Conduct, unless otherwise noted.

With respect to the jurisdiction of this Court over an unadmitted lawyer, Rule 8.5(b) in part provides:
"A lawyer not admitted by the Court of Appeals to practice in this State is subject to the disciplinary authority of this State for conduct that constitutes a violation of these Rules and that:
 "(1) involves the practice of law in this State by that lawyer, or
 "(2) involves that lawyer holding himself or herself out as practicing law in this State[.]"
In Maryland Rules, Title 16, "Courts, Judges, and Attorneys," Chapter 700, "Discipline and Inactive Status of Attorneys," Rule 16–701 g and n respectively define "Disbarment" and "Suspension" to mean permanent or temporary exclusion "from exercising in any manner the privilege of practicing law in this State" when those terms are "applied to an attorney not admitted by the Court of Appeals to practice law."

advertising. Audio tapes of the text of two of the radio ads were preserved. There is no record of how frequently the ads were broadcasted.[5] Judge Rupp found:

> "One of [Smith's] radio advertisements stated that Craig, Harris, and Henderson were 'lawyers with experience in preventing foreclosures ... also for personal injury, employment law, and bankruptcy.' Another of [Smith's] radio advertisements was even more vague, urging listeners who were concerned about losing their homes to call Craig, Harris, and Henderson. Those listeners were urged to call the 'lawyers with experience in preventing foreclosures,' if they may be threatened with foreclosure due to 'sickness, divorce, loss of employment, or whatever.' The advertisement never mentioned bankruptcy. The advertisements targeted those listeners for whom filing for bankruptcy was likely to be appropriate, yet it did not state that [Smith's] practice was limited to bankruptcy law and [the Maryland District]. [Smith] did not outright lie to [one of the client-complainants], or explicitly state that she was admitted to practice in Maryland; nonetheless she held herself out as a Maryland attorney and failed to disclose that her practice was limited to bankruptcy law and the [Maryland District]."

(Citations omitted).

The classified telephone directory, under the heading "lawyers," also carried Smith's name (as Bridgette Harris) in bold type from 1993 to 1996. Beneath her name the ad said, "Specializing in Bankruptcy–Real Estate & Personal Injury." 8201 Corporate Drive, Landover was given as the address, but the telephone number was not that of the Law Firm. Smith testified, without contradiction, that the ad had been placed by Brooks and that she had asked him to remove it. She said that she did not consider herself authorized to require the telephone company to modify the ad.

---

**5.** Rule 7.2(b) requires that "[a] copy or recording of an advertisement ... shall be kept for at least three years after its last dissemination along with a record of when and where it was used." Smith testified that she was unaware of the requirements of this rule. No violation of Rule 7.2(b) is charged in this case.

The letterhead of the Law Firm listed only the Landover address, telephone number, and fax number. It indicated that there are offices in Baltimore, Washington, and Alexandria, but addresses for those offices were not shown. By symbols appearing behind the names of the respective attorneys one is advised that Craig and Henderson are admitted in Maryland and D.C., Smith is admitted in D.C., Virginia, and Pennsylvania, and Johnson is admitted in D.C. and Pennsylvania. Smith also used a professional card which is reproduced (not to scale) below.

TELECOPIER (301) 731–0679

BRIDGETTE HARRIS-SMITH
ATTORNEY AT LAW

CRAIG, HARRIS
HENDERSON & JOHNSON METROPLEX II BUILDING
A LIMITED LIABILITY COMPANY 8201 CORPORATE DRIVE
 (301) 731–0700 SUITE 770
 VA (703) 549-2900 LANDOVER, MD 20785

Smith described the procedures in the Law Firm with respect to clients or prospective clients with whom she had contact. When a prospective client telephoned Smith she questioned the client concerning the client's problem. If the client presented a bankruptcy matter, Smith would have the client arrange for an appointment. If the client presented, for example, a divorce matter, Smith would refer the client to Craig or to Henderson. For the most part neither of the Maryland admitted attorneys in the Law Firm initially interviewed prospective clients who responded to the marketing campaign; Smith initially interviewed them by telephone. Smith labels her telephone interviews of prospective clients as "prescreening." Once Smith had identified a client's matter as a bankruptcy case, she proceeded with the representation without supervision by either of the Maryland attorneys. If the bankruptcy matter required an appearance in a court of the State of Maryland, for example, to oppose a mortgage foreclosure, Smith arranged for the client to be represented there by an attorney admitted in Maryland.

Smith's routine while with the Law Firm was to see clients in the Landover office approximately three days per week and

to work at home on paper work approximately two days per week. She estimated that on average she saw five clients per day, or about fifteen per week.

■ Judge Rupp found that Smith had violated Rule 5.5(a) ("A lawyer shall not ... practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction.") and had violated Maryland Code (1989, 1995 Repl.Vol.), § 10–601(a) of the Business Occupations and Professions Article (BOP) ("Except as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar."). Referring, *inter alia*, to the radio ads and to Smith's professional card, Judge Rupp found that Smith "held herself out as a Maryland attorney and failed to disclose that her practice was limited to bankruptcy law and to the [Maryland District]." Smith excepts to this finding, contending in essence that her practice in Maryland was not unauthorized because the legal representations that she undertook were limited to bankruptcy matters in the Maryland District, and legal services incident thereto.

Conceptually this argument rests on federalism. As the federal system has evolved with respect to the regulation of the practice of law, the license to practice that is issued by a state is territorially oriented and authorizes the practice of law by the licensee at any place within the territorial jurisdiction of the state granting the license. *See Leis v. Flynt,* 439 U.S. 438, 442, 99 S.Ct. 698, 700–01, 58 L.Ed.2d 717, 721–22 (1979) (per curiam). Federal courts, on the other hand, had limited their regulation of attorneys to the grant, withholding, or withdrawal of permission to appear in a matter in the particular federal court. Thus, the broad considerations involved in determining if conduct constitutes the unauthorized practice of law can be overlapping within the same territory. Within that framework, we emphasize as a preliminary matter that this case does not involve an attorney whose principal office for the practice of law is in a jurisdiction where that attorney is admitted, and where the nature of the transaction or litigation

in which the attorney is representing a client takes the attorney into a jurisdiction where the attorney is not admitted. Here, Smith does not seek to defend against the charge of unauthorized practice by contending that her principal office for the practice of law was located in Pennsylvania, the District of Columbia, or Virginia, and that Maryland clients, attracted to her at one of those locations, had problems for which she concluded that bankruptcy in the Maryland District was the appropriate remedy. Nor does Smith argue that her client contact was subject to the supervision of a Maryland admitted attorney. See *Attorney Grievance Comm'n v. Hallmon,* 343 Md. 390, 681 A.2d 510 (1996); *In re Application of R.G.S.,* 312 Md. 626, 541 A.2d 977 (1988).

The defense raised by Smith is also to be distinguished from that aspect of federalism illustrated by *Sperry v. Florida,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963). In *Sperry*

"[f]ederal statutes authorize[d] the Commissioner of Patents to prescribe regulations governing the recognition and conduct of agents, attorneys and other persons representing applicants before the Patent Office. Sperry, who was a patent agent recognized by the Commissioner of Patents, maintained an office in Tampa, Florida where he held himself out to the public as practicing patent law. The Supreme Court of Florida enjoined Sperry from engaging in the practice of law, including specific prohibitions against rendering legal opinions as to patentability and infringement, and against holding himself out as qualified to prepare and prosecute applications for letters patent. Applying the Supremacy Clause the Supreme Court vacated and remanded the decree 'since it prohibits [Sperry] from performing tasks which are incident to the preparation and prosecution of patent applications before the Patent Office.' *Id.* at 404, 83 S.Ct. at 1336, 10 L.Ed.2d at 443."

*Kennedy,* 316 Md. at 661–62, 561 A.2d at 208.[6]

---

**6.** We do not imply that the *Sperry* doctrine is limited to practice before the United States Patent Office or to federal agency practice. For example, federal bankruptcy Rule 9010(a) provides that

Here, Smith defends solely on the basis of one aspect of our holding in *Kennedy*. That case was an appeal from an injunction against unauthorized practice of law. Kennedy had been admitted only in the District of Columbia and to the Maryland District bar, but he formed a partnership with a Maryland admitted attorney. The firm opened in Silver Spring, Maryland its sole office for the practice of law, not counting a sham office used as a mail drop in Washington, D.C. *Id.* at 652–53, 561 A.2d at 203. From the Silver Spring office Kennedy conducted a general practice of law that employed five secretaries and consisted principally of debt collection for physicians. *Id.* at 653, 561 A.2d at 204. Kennedy presented two arguments attacking the breadth of the injunction against him. First, he said that he could practice from a principal office in Maryland on matters as to which he was applying the substantive law of the United States or of a jurisdiction other than Maryland. We rejected that construction of BOP § 10–601(a) because it "would defeat the goal of protecting the public from incompetent and/or unethical practitioners and would be impossible to apply and enforce in the real world." *Id.* at 662, 561 A.2d at 208.

Second, Kennedy argued the overbreadth of a provision in the injunction directing that he " 'immediately cease interviewing or communicating, orally or in writing, with any clients of

"[a] debtor, creditor, equity security holder, indenture trustee, committee or other party may (1) appear in a case under the Code and act either in the entity's own behalf or by an attorney authorized to practice in the court, and (2) perform any act not constituting the practice of law, by an authorized agent, attorney in fact, or proxy." In *State Unauthorized Practice of Law Committee v. Paul Mason & Associates, Inc.*, 46 F.3d 469 (5th Cir.1995), the appellee, trading as Creditors Bankruptcy Service, acted as agent for national retailers in administering their noncontingent, liquidated claims against debtors in bankruptcy. The services included filing proof of claim, monitoring case status, and, under certain circumstances, negotiating a reaffirmation of the debt in lieu of relinquishing collateral. *Id.* at 470. The Fifth Circuit sustained this practice against a challenge by the Texas bar. Relying on *Sperry* the court held that Bankruptcy Rule 9010(a) was to be interpreted "in light of its legislative history and the standards applicable to the bankruptcy practice as recognized by federal courts, not according to the law of the forum state." *Id.* at 471–72.

his or of [his partner] at, or from, any office or location whatsoever within the State of Maryland[.]' " *Id.* at 669, 561 A.2d at 212. We agreed that this provision was too broad because, in addition to Kennedy's existing federal court clients, the injunction should not "prohibit Kennedy from considering, and accepting, representation in any matters before, or to be filed in, [the Maryland District but,] which may come to him in the future in a manner which does not violate the injunction." *Id.* at 669–70, 561 A.2d at 212. We then referred to an earlier discussion in the opinion.

In that earlier discussion we distinguished the facts in *Kennedy* from the scenario in which an attorney who maintains a principal office for the practice of law elsewhere and who is admitted to the Maryland District may journey "to the conclusion of the federal matter while performing in Maryland whatever was reasonably required in the representation of the client." *Id.* at 665, 561 A.2d at 210. Kennedy, on the other hand, maintained his principal office for the general practice of law in Maryland where he was not admitted. We said that

"Kennedy may not utilize his admission to the bar of the federal court in Maryland, or his admission in Washington, D.C., as a shield against injunctive relief by asserting that he will operate a triage. He is not permitted to sort through clients who may present themselves at his Maryland office and represent only those whose legal matters would require suit or defense in a Washington, D.C. court or in the federal court of Maryland because the very acts of interview, analysis and explanation of legal rights constitute practicing law in Maryland. For an unadmitted person to do so on a regular basis from a Maryland principal office is the unauthorized practice of law in Maryland."

*Id.* at 666, 561 A.2d at 210.

Smith's defense in the instant matter rests on a passage in *Kennedy* where we said that "[w]e will not go so far as to say that it is theoretically impossible for Kennedy to maintain a principal office in Maryland exclusively for engaging in a practice before the [Maryland District]. It seems, however,

that it would be practically impossible to do so." *Id.* at 667, 561 A.2d at 211. Accordingly, we did not foreclose the possibility of Kennedy's submitting a proposal for modifying the injunction to the court issuing it "whereby Kennedy, *without holding himself out as a practicing lawyer in Maryland,* could first pinpoint clients whose specific matters actually require counsel before those courts where Kennedy is currently admitted to practice, and thereby could limit his legal representation in Maryland to those specific matters." *Id.* at 667–68, 561 A.2d at 211 (emphasis added). By a footnote we suggested as an example limiting the practice to referrals by other attorneys. *Id.* at 668 n. 9, 561 A.2d at 211 n. 9. The practical impossibility lies in our conclusion that, ordinarily, "advising clients by applying legal principles to the client's problem is practicing law." *Id.* at 663, 561 A.2d at 208. Moreover, as recently as this year we have reiterated the concept of practicing law set forth in *Kennedy.* *See Attorney Grievance Comm'n v. Shaw,* 354 Md. 636, 649, 732 A.2d 876, 882 (1999).

Our holding in *Kennedy* is consistent with Restatement (Third) of the Law Governing Lawyers § 3, at 22 (proposed final draft No. 2, 1998) in which the following rule is presented:

"A lawyer currently admitted to practice in a jurisdiction may provide legal services to clients in a matter:

"(1) at any place within the admitting jurisdiction;

"(2) before a tribunal or administrative agency of another jurisdiction or the federal government in compliance with requirements for temporary or regular admission to practice before that tribunal or agency; and

"(3) at a place within a jurisdiction in which the lawyer is not admitted to the extent the lawyer's activities *in the matter* arise out of or are otherwise reasonably related to the lawyer's practice under Subsection (1) or (2)."

(Emphasis added).

Comment *e* to draft Restatement § 3 cites *Kennedy* as one of several cases that "involve clear instances of impermissible

practice, through setting up a local office in a state in which the lawyer is not admitted." *Id.* at 33. That comment condenses the holding in *Kennedy* to be "out-of-state lawyer could not open local office for practice of federal law." *Id.* Professor Wolfram, who is the chief reporter for the Restatement of the Law Governing Lawyers, has written that Kennedy "was caught advising Maryland clients from his principal, and only office. Kennedy was rather plainly practicing law in unauthorized form." C.W. Wolfram, *Sneaking Around in the Legal Profession: Interjurisdictional Unauthorized Practice by Transactional Lawyers,* 36 S. Tex. L.Rev. 665, 697 (1995) (*Sneaking Around* ).

What might be called the federal exception to a prohibition against unauthorized practice was held to be inapplicable in *Ranta v. McCarney,* 391 N.W.2d 161 (N.D.1986), and *Ginsburg v. Kovrak,* 392 Pa. 143, 139 A.2d 889 (1958) (per curiam), where unadmitted attorneys had opened offices and regularly practiced, limiting their practices to matters of federal tax law.

Smith's federal exception defense in this case is that she "pinpointed" bankruptcy cases. Judge Rupp, however, found that Smith held herself out to the public as practicing law generally. The matters that came to her were analyzed by her to determine whether action in the Maryland District bankruptcy court was the proper course of action. *See Somuah v. Flachs,* 352 Md. 241, 262, 721 A.2d 680, 690 (1998) (noting that the unauthorized practice of law includes "[u]tilizing legal education, training, and experience . . . [to apply] the special analysis of the profession to a client's problem") (quoting *Kennedy,* 316 Md. at 662, 561 A.2d at 208 (alterations and ellipsis in original)). When Smith initially analyzed matters that came to her after holding herself out as practicing law in Maryland, Smith did not advise the clients that she was limiting her legal representation to specific matters that were to be bankruptcy proceedings. Indeed, Judge Rupp found that one of Smith's clients was under the impression that Smith would represent her in a suit against a mortgage lender arising out of the foreclosure on the client's home.

There are two additional reasons why we hold that Smith, without the intervention of a Maryland admitted attorney, engaged in the unauthorized practice of law in Maryland even though she personally attempted to operate the "triage." *Id.* at 666, 561 A.2d at 210. In determining that a bankruptcy proceeding in the Maryland District is the appropriate remedy for the client's problem, Smith was professionally required to review the facts and to decide the appropriate course of action, *e.g.,* to determine whether there were any contract defenses to the claims of the principal creditors. There is a danger that lawyers in the position in which Smith placed herself "would be motivated to cant advice artificially in the safe direction." *Sneaking Around,* 36 S. Tex. L.Rev. at 698. Further, there is always the danger that the operation of the triage by the unadmitted attorney, from an office for the general practice of law in Maryland, will be used "as a shield behind which to conduct an unlimited-in-fact law practice." *Id.*

On facts substantially analogous to those in the matter before us the United States Bankruptcy Court for the District of Connecticut has held that an attorney was engaging in the unauthorized practice of law in that state. *In re Peterson,* 163 B.R. 665 (Bkrtcy.D.Conn.1994). There an attorney, one Betsos, who was admitted in New York but not in Connecticut maintained a law office in Connecticut. The facts were that Betsos

"met with the debtors and several other clients in Connecticut; he made phone calls from his office on legal matters; his letterhead indicated he was an attorney-at-law; he advised the debtors regarding the advisability of filing a bankruptcy petition, which chapter of the code to file under, and their rights and duties under the code; he prepared and filed several bankruptcy petitions and schedules; he reviewed and prepared bankruptcy documents; he corresponded with a receiver of rents appointed under Connecticut law; he appeared in court and negotiated with creditors on his client's behalf; and he attended § 341(a) meetings."

*Id.* at 672. The court held that Betsos could not retain any part of the fee that had been paid to him by a debtor because

his conduct was the unauthorized practice of law in Connecticut. Betsos had argued that a "person may generally practice law if he or she is authorized to practice in the United States District Court for the District of Connecticut." *Id.* at 673. Rejecting that argument the court said:

> "The flaw in that argument is that it fails to recognize the distinction between the right to practice in a court and the right to practice law *generally.* The essence of that distinction is that the general practice of law connotes the right to offer legal services to anyone who seeks them, whereas the right to practice in a court is limited to providing legal services that are incidental to a specific case or proceeding pending in that court."

*Id.* at 673.

Restating its holding, the Bankruptcy Court in Connecticut further said:

> "Put another way, an attorney who is not licensed by the State of Connecticut but who is authorized to practice before the bankruptcy court may, notwithstanding [the Connecticut prohibition against unauthorized practice], practice law in this state and even maintain an office here so long as the services rendered are limited to those reasonably necessary and incident to the specific matter pending in this court. There is a difference, however, between maintaining an office in this state for the convenience of litigating a matter in this court and maintaining such an office for the purpose of giving legal advice on bankruptcy matters to all clients who seek it and accepting all cases which can be filed here. In the instant case, the evidence disclosed that Betsos held himself out to give advice to 'all comers' on bankruptcy matters."

*Id.* at 675 (citation omitted).

For the foregoing reasons Smith's exceptions to the finding of her violation of Rule 5.5, and the related violation of BOP § 10–601, are overruled.

## II

■ Bar Counsel charged, and Judge Rupp found, two other violations of the Rules that are aspects of the course of conduct described in Part I, *supra.* Specifically Smith was found to have violated Rules 7.1 and 7.5. The former provides that

"[a] lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it:

"(a) contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading[.]"

Rule 7.5(a) provides that "[a] lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1."

These violations flow from the fact that Smith generally did not advise prospective clients that she was not admitted to practice in Maryland and from her use of the professional card, reproduced above.[7] The card gives the Landover, Maryland address of Smith's office and thereby indicates that she is a Maryland lawyer.

In *Attorney Grievance Commission v. Brown,* 353 Md. 271, 725 A.2d 1069 (1999), Brown, a licensed Maryland attorney, was assisted by a Virginia attorney (Wilder) in representing a client before a Maryland state agency. *Id.* at 276–77, 725 A.2d at 1071–72. Brown used a letterhead that included Wilder's name as co-counsel in the case, without, however, indicating that the latter was not licensed to practice in Maryland. *Id.* at 290, 725 A.2d at 1078. We found that Brown violated Rules 7.5(b) and 7.1 because his "omission on his letterhead that Mr. Wilder was not licensed to practice in Maryland courts without special admission could have misled each of his clients . . . into believing he or she was receiving proper representation from both attorneys." *Id. Cf. Somuah,* 352 Md. at 257, 721 A.2d at

---

7. There is no contention that the Law Firm's letterhead violated either Rule.

687–88 (noting that a client had a good faith basis for discharging her attorney when he failed to explain the limit imposed on his practice by being unlicensed in Maryland). Smith's failure to advise clients of the limits of her practice and her use of a professional card listing a Maryland office are similarly misleading. Smith's exceptions to these findings of violation are overruled.

 Bar Counsel excepts to Judge Rupp's finding that Smith did not violate Rule 8.4(b) ("It is professional misconduct for a lawyer to ... commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."). Bar Counsel argues that Rule 8.4(b) was violated because, under BOP § 10–606, it is a misdemeanor to violate BOP § 10–601.

Judge Rupp's finding is not clearly erroneous. The tenor of the entire record is that Smith was attempting to conduct a bankruptcy practice in a lawful manner by limiting her court appearances to the federal district. That was a mistaken conclusion in light of *Kennedy*, which had been decided in 1988, but a mistaken conclusion is not a violation of Rule 8.4(b). Further, there was uncontradicted and uncontroverted evidence that on more than one occasion an Assistant Bar Counsel had spoken to Smith by telephone, obtained from her samples of the Law Firm's letterhead and of her professional card, and that Smith heard nothing further.

### III

On the complaint of Annette and Lamont Bell, Smith was found to have violated Rule 1.16(d) which in part provides that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... refunding any advance payment of fee that has not been earned."

The Bells, husband and wife, sought Smith's services in response to one of the radio ads. They were delinquent on their residential mortgage, and Mr. Bell was delinquent in rent payments on the lease for his business premises. Both

properties were located in Maryland. Smith recommended a Chapter 13 proceeding for Mrs. Bell and a Chapter 7 for Mr. Bell. There were three meetings between the Bells and Smith at the Landover office. Smith quoted a fee of $1,200 for both proceedings, of which the Bells paid $840. The understanding was that Smith would begin work on the petitions, but would not file until the entire fee had been paid. The Bells became disenchanted with Smith, and the petitions were never filed. These events took place in September and October of 1995. In August 1998, when the instant disciplinary proceedings were being tried before Judge Rupp, Smith refunded the entire fee to the Bells.

Smith's position is that the $840 was fully earned by the work that she had done prior to the termination of her services. Judge Rupp found a Rule 1.16 violation inasmuch as "[n]o record of time spent on the Bells' case was presented, nor has [Smith] presented any evidence of legal work that she completed on behalf of her clients to justify the retention of the Bells' money." That conclusion is not clearly erroneous.

## IV

Ms. Kennis Henry complained to Bar Counsel when, in November of 1995, she received a letter from a mortgage company that offered to refinance her home. The letter indicated that it was written in response to a request by Smith. Ms. Henry had retained Smith in March 1994 concerning the potential foreclosure of the mortgage on Ms. Henry's residence, after the latter had seen a newspaper advertisement for bankruptcy assistance. Smith filed the initial papers to declare bankruptcy, but eventually withdrew from representing Ms. Henry. It developed that a non-lawyer member of Smith's support staff, without Smith's knowledge, had released Smith's client list to the soliciting mortgage lender. Judge Rupp found that this violated Rule 5.3(b) under which "a lawyer having direct supervisory authority over [a] non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." Smith contends that no reasonable

person could foresee this action on the part of the non-lawyer member of her staff. Her exception is overruled. It was not clearly erroneous for Judge Rupp to conclude that proper training of the lay staff in keeping client matters confidential would have avoided the unauthorized disclosure.

## V

The complaint of Ms. Marcella Miller resulted in a finding that Smith violated Rule 1.15(b) which requires that an attorney promptly notify a client or third person upon receiving funds in which the client or third person has an interest. The facts, briefly stated, are that Ms. Miller had contacted Smith in response to a radio ad in order to attempt to save from foreclosure a house that Ms. Miller owned in New Jersey. Smith filed a proceeding in Maryland prior to receipt in full of her fee of $1,200. The fee agreement provided that Smith was entitled to a lien against property she held on behalf of the client. Smith and Ms. Miller had a falling out and, in approximately early November 1995, the bankruptcy proceedings were dismissed, for reasons that are not argued to be involved in any of the charges in this case. At the time of the dismissal there was a deposit of $350 in the hands of the bankruptcy trustee that was refundable to Ms. Miller. Smith prevailed upon the trustee to return Ms. Miller's deposit to Smith. Smith did not advise Ms. Miller of the receipt of the funds, and the trustee subsequently informed Ms. Miller that the funds had been sent to Smith.

Smith does not formally except to the finding of a violation based on the failure to notify the client; rather, she argues simply that the violation is at worst one resulting from her mistaken belief concerning her authority under the terms of the retainer.

## VI

Bar Counsel also charged violations based on the complaint of Ms. Shirley Jones, but the only charge which Judge Rupp found to be sustained based on that complaint had to do with

the unauthorized practice of law which we have discussed in Part I, *supra.* The complaint followed the pattern of the other complaints in that Ms. Jones responded to an advertisement, her home in Maryland was under threat of foreclosure, Smith obtained a fee, there was a parting of the ways, and Smith refunded the unearned portion of the fee.

The variation from the pattern in the Jones complaint is that Smith advised Ms. Jones that she needed an attorney licensed in Maryland to contest the foreclosure, and Ms. Jones consented to Smith's associating with Benny Brooks, Smith's former employer. Instead of quoting the usual $1,200 fee that Smith charged for a Chapter 13 proceeding, the fee arrangement with Ms. Jones was $150 per hour. Ms. Jones paid a retainer of $2,500, no bankruptcy petition was ever filed, and Smith refunded $2,000 to Ms. Jones in June 1996, after she had complained to Bar Counsel.

## VII

In this Part VII we consider the sanction. Although the petition for disciplinary action against Smith charged violations of Rule 8.4(b) and (c), both of which would be serious violations going to the attorney's integrity, Judge Rupp found in favor of Smith on those charges. The continuing violation in this case is the unauthorized practice of law. It results from Smith's attempt to practice within the limits of her admission to the bar of the federal district. That attempt was unsuccessful solely at the beginning of the process, when Smith analyzed the problems presented by those who sought her services and advised them how to proceed. Relative to the remaining charges that have been established, the most serious among them is the use of the professional card that did not disclose the limitation on Smith's practice. Yet, once a relationship with a client or prospective client progressed to the point when Smith was corresponding, the letterhead on the Law Firm stationery adequately disclosed the limitation.

Another consideration is the objective to be served by the sanction. In the instant matter the Law Firm dissolved when

the investigation by Bar Counsel commenced. Smith now practices from an office in the District of Columbia where she is licensed. From her office in the District of Columbia, Smith can authorizedly obtain the facts of the problem presented by prospective clients and advise them how to proceed, either through her, or, if she chooses to limit her practice, through some other attorney. If the appropriate remedy for a client's problem is a bankruptcy proceeding in the Maryland District, Smith has a safe conduct pass to handle the identified matter by virtue of her admission to the bar of that court. Thus, the principal objective to be obtained by sanction in this case is to deter other unadmitted attorneys from undertaking a federal practice from an office in Maryland from which the non-admitted attorney would hold himself or herself out to the public as generally practicing law in order to identify cases that the attorney was authorized to handle.

Moreover, the instant matter is unlike the unauthorized practice of law that was presented in *Attorney Grievance Commission v. Harper*, 356 Md. 53, 737 A.2d 557 (1999), and in *Attorney Grievance Commission v. James*, 353 Md. 681, 728 A.2d 697 (1999). James was an admitted but suspended lawyer who continued to practice law from his Maryland office after he had been suspended. Harper was a non-admitted lawyer who opened an office for the general practice of law in Maryland. Each case presented purely a territorial issue, with no federal overlay. We disbarred both James and Harper.

*Kennedy*, 316 Md. 646, 561 A.2d 200, did present a federal overlay but not in the context of a disciplinary proceeding. Kennedy was not admitted to practice in Maryland and did not in fact attempt to limit his practice from his Maryland office to matters before the Maryland District. The federal overlay issue arose in *Kennedy* only after he had been enjoined from the unauthorized practice of law, and he sought to limit the scope of the state court injunction. When disciplinary proceedings were brought against him, Kennedy consented to disbarment. *Attorney Grievance Comm'n v. Kennedy*, 319

Md. 110, 570 A.2d 1243 (1990). This triggered a reciprocal discipline proceeding in the District of Columbia where Kennedy was admitted. *In re Kennedy*, 605 A.2d 600 (D.C.1992). Kennedy had previously been informally admonished in the District of Columbia, and he had previously been suspended for ninety days in 1988 for three violations, including practicing law while suspended. *Id.* at 604. In the reciprocal discipline case the District of Columbia Court of Appeals suspended Kennedy for nine months "with the requirement that he seek reinstatement before readmission." *Id.* at 605.

Recently *Attorney Grievance Commission v. Brown*, 353 Md. 271, 725 A.2d 1069 (1999), involved numerous violations by an attorney, including failure to pursue matters diligently, failure to communicate with clients, and a violation of Rule 8.4(c) (engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation") based on having drawn a check to a court clerk against insufficient funds and thereafter failing to make the check good. Brown also failed to cooperate with Bar Counsel. Amidst all of these violations was the failure to identify on a letterhead that his associate counsel was limited to practicing in Virginia. We indefinitely suspended Brown, with the right to reapply within one year. *Id.* at 296, 725 A.2d at 1081.

More analogous to the instant matter is *Attorney Grievance Commission v. Hallmon*, 343 Md. 390, 681 A.2d 510 (1996). Hallmon committed three violations: failure to maintain a trust account, failure to respond to Bar Counsel, and assisting a lay person in the unauthorized practice of law by turning over to that lay person the presentation of the case on behalf of an applicant for a special exception before a zoning hearing officer. Hallmon was suspended for ninety days for the three violations. *Id.* at 410, 681 A.2d at 520.

Taking into consideration all of the circumstances of the instant matter, we suspend Smith for thirty days, effective thirty days from the filing of this opinion.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT,*

*INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST BRIDGETTE HARRIS–SMITH.*