*Attorney Grievance Commission of Maryland v. Charles Allan Fineblum*, Misc. Docket AG No. 3, September Term, 2020

**ATTORNEY MISCONDUCT — DISCIPLINE — SUSPENSION**
Respondent, Charles Allan Fineblum, violated Maryland's Rules of Professional Conduct 1.4, 1.15, 5.3, 5.4, 5.5, and 8.4, along with Maryland Rules 19-407 and 19-408. These violations arose from his delegation of significant responsibilities in personal injury matters to an independent paralegal firm; his lack of supervision over that paralegal firm and his clients' cases; his sharing of fees with that firm; and his failure to properly manage his attorney trust account. In light of the application of several mitigating factors, a suspension of six months and one day is the appropriate sanction for Respondent's misconduct.

Circuit Court for Baltimore County
Case No. C-03-CV-20-001260
Argued: February 1, 2021

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 3

September Term, 2020

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CHARLES ALLAN FINEBLUM

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

    JJ.

_____

Opinion by Barbera, C.J.

_____

Filed:  April 26, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On March 18, 2020, Petitioner, the Attorney Grievance Commission, acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Respondent, Charles Allan Fineblum. The Petition concerned Respondent's alleged failure to oversee the work of an independent paralegal firm, the improper sharing of legal fees with that firm, his lack of involvement in certain personal injury clients' cases, and the mishandling of his attorney trust account. Bar Counsel alleged that Respondent's conduct constituted violations of Maryland Attorneys' Rules of Professional Conduct[1] ("MARPC") 1.1 (Competence), 1.4(a) and (b) (Communication), 1.15(a) and (b) (Safekeeping Property), 5.3(a), (b), and (c) (Responsibilities Regarding Non-Attorney Assistants), 5.4(a) (Professional Independence of an Attorney), 5.5(a) (Unauthorized Practice of Law), and 8.4(a), (c), and (d) (Misconduct), in addition to Maryland Rules 19-407(a)(3), (a)(4), and (b) (Attorney Trust Account Record-Keeping) and 19-408 (Commingling Funds). Bar Counsel also asserted that Respondent violated the prior versions of those rules.[2]

---

[1] At the beginning of the period of alleged misconduct, these rules were part of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and were codified in an appendix to Maryland Rule 16-812. Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct and were recodified in Title 19 of the Maryland Rules. *See* Maryland Rules 19-300.1 *et seq.* As there is no substantive difference between the two codifications of the rules, we shall employ throughout this opinion the simpler version of the charged rule violations, as set forth in the MLRPC. Consequently, where applicable we refer to charged violations, including those that are alleged to have occurred after recodification, by the form used in the MLRPC, *e.g.*, "Rule 1.1" rather than "Maryland Rule 19-301.1."

[2] In some instances, it is unclear based upon the record before us whether Respondent's conduct violated the current version of a rule, the version in place prior to July of 2016, or both. However, for the purpose of determining the proper sanction it is irrelevant which codification was in place at the time of the misconduct.

On March 20, 2020, this Court designated the Honorable John J. Nagle, III of the Circuit Court for Baltimore County to serve as the hearing judge. On May 21, 2020, Bar Counsel served Respondent via authorized counsel with the following: a Writ of Summons issued on March 23, 2020 by the Circuit Court for Baltimore County; the Order of the Court of Appeals; and the Petition for Disciplinary or Remedial Action. On June 22, 2020, Respondent filed an Answer to Petition for Disciplinary or Remedial Action.

The circuit court held the hearing remotely on September 9, 2020 using Zoom for Government. After the parties made their opening statements, they submitted a Joint Statement of Stipulated Facts. Bar Counsel did not call any witnesses and rested Petitioner's case-in-chief after submitting twenty-five of its own exhibits, including a transcript of Respondent's statement under oath, given on May 17, 2019. The hearing judge then heard from the following character witnesses who appeared on Respondent's behalf: the Honorable Sally C. Chester of the District Court of Maryland sitting in Baltimore County, Lee Jacobson, Esq., and C. Kelly Gordon, one of Respondent's former clients. The witnesses testified to Respondent's integrity, honesty, and dedication to the practice of law. Respondent also testified. He stated that although he never knowingly violated any ethical rules, he accepted responsibility for his shortcomings and expressed regret and contrition for his actions.

After the hearing, Petitioner withdrew the charge that Respondent's conduct violated Rule 1.4(a), as well as the charges that Respondent's conduct prior to July 1, 2016 violated the predecessors to current Maryland Rules 19-301.15(a) and (b), 19-407(a)(3),

2

(a)(4), and (b), and 19-408. On October 23, 2020, Judge Nagle issued his Statement of Findings of Fact and Conclusions of Law. On November 12, 2020, Petitioner filed its Recommendation for Sanction, recommending that Respondent be indefinitely suspended. That same day Respondent filed his Exceptions and Recommendations, in which he advocated for a reprimand.

We adopt in large part the hearing judge's findings of fact and conclusions of law. Based on Respondent's rule violations found herein, as well as the aggravating and mitigating factors we have identified, we suspend Respondent for a period of six months and one day.

# I.

## The Hearing Judge's Findings of Fact

We summarize here the hearing judge's findings of fact, which are supported by clear and convincing evidence.

### Background

Respondent was admitted to the Maryland Bar on January 14, 1972. After clerking for the Honorable Marshall Levin on the Supreme Bench of Baltimore City, Respondent served in the Office of the Public Defender before entering private practice full time. During the relevant period, from 2008 through 2018, and continuing through today, Respondent has practiced as a sole practitioner in Baltimore County, focusing primarily on "auto negligence, domestic work, DUI, [and] DWI" cases. Since his admission, Respondent has had no history of attorney discipline.

3

*Respondent's Relationship with RT & Associates*

In June of 2008, William Ronald Tilghman formed a close corporation known as RT & Associates, Inc. ("RT & Associates") with the express purpose of performing paralegal services. Tilghman ran RT & Associates out of his home in Cockeysville, Maryland. During the relevant time frame of 2008 through 2018, neither Tilghman nor the other employees of RT & Associates were licensed to practice law in any jurisdiction. Furthermore, the hearing judge found that there was "no evidence that the Respondent ever affirmatively held Tilghman or anyone at RT & Associates out as attorneys or affirmatively represented to anyone that they were licensed to practice law in Maryland or elsewhere."

The hearing judge found that "[b]eginning at or about the time RT & Associates was formed in 2008 and continuing through 2018, Respondent utilized RT & Associates as an independent contractor to provide services in the processing and resolution of personal injury cases." Respondent acknowledged during Bar Counsel's investigation that he delegated significant responsibility to RT & Associates regarding client communications and pre-litigation case management. Respondent did not, however, have a formal written agreement with RT & Associates.

Respondent's "understanding of the agreement was that [RT & Associates] would work up cases and [Respondent's] name would be listed as the attorney on the case." In correspondence sent to Bar Counsel during the investigation, Respondent described the general duties and responsibilities of RT & Associates as follows:

> [RT & Associates] performed such paralegal functions as client
> intake, preparing letters of representation for my signature, ordering and

4

compiling police reports and medical records, scheduling clients for medical treatment, processing PIP [i.e. personal injury protection] claims, and working with responsible insurance carriers to resolve property damage claims, rental cars, repairs, etc. He also helped to prepare settlement demands and assisted in the resolution of bodily injury claims. By outsourcing these tasks, I was able to obtain support services and resources similar to those of a much larger firm. This has allowed me to focus more of my time on the preparation of cases for trial and similarly substantive tasks.

\* \* \*

Although he was careful to identify himself as my legal assistant, Mr. Tilghman had extensive client communication to obtain information regarding the facts of the underlying accident, the completion of PIP applications, coordinating medical treatment, and handling property damage, repairs and rental car needs. I found his assistance to be invaluable in assuring prompt service to the clients in the wake of an automobile accident.

During his statement under oath, Respondent admitted that RT & Associates sometimes settled cases without his involvement. Of those cases, Respondent stated that he was "mostly" aware of the clients, but did not know about "some" of them. He also admitted that RT & Associates referred "75 to 80 percent" of his personal injury clients to him. Respondent explained that RT & Associates would have a client matter "in their office, but everything was under [his] name as the sole attorney on the case." Respondent also stated that clients would generally contact RT & Associates prior to having contact with himself.

According to Respondent, although the staff of RT & Associates occasionally worked in Respondent's law office, they usually worked off site. The staff maintained their own set of client files and provided Respondent with copies thereof. Respondent also authorized the staff at RT & Associates to use Respondent's letterhead at their discretion,

and he admitted that he often permitted them to sign his name to correspondence that he had not reviewed.

*Respondent's Payments to RT & Associates*

Respondent did not have a formal fee arrangement with RT & Associates. He also did not receive periodic billing invoices or statements of services rendered. Rather, his practice was to compensate RT & Associates out of his trust account with the proceeds of his clients' personal injury claims, "taking into account the extent of the support which [Tilghman] and his staff provided and the nature of the case itself." He admitted that prior to the investigation, in calculating what he believed to be the appropriate compensation to RT & Associates, he would also take into account the outcome of the case. After consultation with his counsel in this proceeding, Respondent claims that he has abandoned this practice, and has not paid RT & Associates directly out of his trust account since the summer of 2018.

During the course of the investigation, Respondent produced to Bar Counsel a schedule of the personal injury client matters in which his clients recovered on their claims from 2014 through 2018.[3] For each matter, the table listed the settlement amount, the attorney's fee, and the support expense paid to RT & Associates, which was deducted from the total attorney's fee rather than charged to the client directly. For almost every client matter listed the support expense was greater than the amount of the attorney's fee retained

---

[3] The hearing judge described the schedule as running "from 2014 through 2017." Although the precise end date of the table is unclear, it includes several pages of entries for 2018.

6

by Respondent. During his statement under oath, Respondent explained that this was because "the staff [at RT & Associates] normally in these cases performed mostly all of the work relative to the case."

Respondent's tax filings show that between 2013 and 2017, Respondent: (i) paid RT & Associates, and (ii) reported profits or losses following deduction of expenses, as follows:

|  | Amount Respondent Paid RT & Associates | Respondent's Profits or Losses |
|---|---|---|
| 2013 | $141,218.00 | $23,140.00 |
| 2014 | $174,918.00 | ($7,051.00) |
| 2015 | $221,473.00 | ($11,810.00) |
| 2016 | $311,773.00 | $2,459.00 |
| 2017 | $308,384.00 | $26,785.00 |
| Sum | $1,157,766.00 | $33,523.00 |

*Representation of Jeron Morris*

On December 28, 2017, Jeron Morris was involved in a motor vehicle accident in Baltimore City. The following day he attempted to call Respondent's law office and was connected to Tilghman. They spoke about the injuries Morris sustained in the accident, and Morris provided Tilghman with his insurance information and that of the other driver. Following the call, RT & Associates faxed a Health Insurance Portability and Accountability Act (HIPAA) release form and a Retainer Agreement to Morris. Morris then signed and returned the documents. The heading on the Retainer Agreement listed Respondent's name, and the document identified Respondent as Morris's "attorney to

7

prosecute a claim for [p]ersonal injuries" against the other driver involved in the accident. No other attorney's name appears on the agreement. When Morris signed the Retainer Agreement on December 29, 2017, he became Respondent's client until Morris ultimately terminated the relationship approximately forty days later.

On January 26, 2018, Morris signed a document titled "Dismissal of Counsel," which indicated that he was discharging Respondent as his attorney in relation to the motor vehicle accident. That same day, Morris also retained The Killian Law Group, a law firm in Owings Mills, to represent him in the action going forward. On or around February 6, 2018, Alex Binder, Esquire of The Killian Law Group contacted Respondent, informing Respondent that his firm was replacing Respondent as Morris's counsel. Respondent only saw the discharge notice signed by Morris after Respondent's conversation with Binder. Thereafter, on February 8, 2018, Respondent transmitted his client file in the Morris matter to Binder.

During his statement under oath prior to the hearing, Respondent indicated that he did not know how Morris had contacted RT & Associates. Respondent never met with or spoke to Morris during the period of representation, but he also never refused to communicate with him. Morris never attempted to communicate directly with Respondent prior to terminating the representation.

On or around February 15, 2018, Morris filed a complaint against "Ronald Tilghman" with the Attorney Grievance Commission. In the complaint, he identified Tilghman as the "Paralegal of Charles A. Fineblum Attorney and Couselors [sic] at Law."

8

That complaint caused Bar Counsel to initiate its investigation of Respondent and his relationship with RT & Associates.[4]

*Respondent's Trust Account Practices*

During the relevant period, Respondent maintained an attorney trust account at Bank of America. During the investigation, Bar Counsel subpoenaed the trust account records for January 2017 through January 2019. Respondent admitted during his statement under oath prior to the hearing that he did not perform the requisite monthly reconciliations, as mandated by Maryland Rule 19-407(b).

Respondent also admitted that the only written records he kept in relation to his trust account were his check stubs. From those stubs, he claimed that he could identify which clients' funds remained in the trust account at the end of any given month. He admitted, though, that he could not account for every single cent in the trust account at month's end. He acknowledged that his reconciliation practices were not "perfect," but he stated that he was working to fix the deficiencies.

---

[4] At the hearing, Bar Counsel offered the complaint as an exhibit. As Morris did not appear at the hearing, Respondent's counsel objected to its admission as inadmissible hearsay and an improper substitute for the live testimony of a complainant who failed to appear for trial. The hearing judge admitted the complaint not for the truth of its contents, but for the limited purpose of providing context for Respondent's subsequent response to Bar Counsel and the ensuing investigation. In any event, the parties have stipulated to the pertinent facts in relation to Respondent's representation of Morris.

Respondent further admitted that he would often leave earned attorney's fees in his trust account for "a period of days or weeks."[5] He also did not know the precise amount of his own money remaining in the trust account at any given time. He apologized for the practice during his statement under oath, and later indicated that he had ended it "well over a year" prior to the hearing, which took place on September 9, 2020.

## II.

### The Hearing Judge's Conclusions of Law

The hearing judge first found that Respondent's conduct did not violate Rule 1.1. The hearing judge then found that Respondent had violated Rules 1.4(b); 5.3(a)–(c); 5.4(a); 5.5(a); 8.4(a) and (d);[6] 1.15(a) and (b); and Maryland Rules 19-407(a)(3), (a)(4), and (b); and 19-408.[7] Respondent excepted to some of the hearing judge's findings of fact and conclusions of law. Bar Counsel excepted to none.

---

[5] Respondent explained during his statement under oath that he had adopted this practice as a result of being advised early on in his career never to allow an escrow check to bounce.

[6] The hearing judge concluded that there was insufficient evidence to find that Respondent had violated Rule 8.4(c).

[7] The hearing judge dealt separately with the pre- and post-July 2016 versions of the rules. As Petitioner withdrew its claims that Respondent violated the pre-July 2016 versions of Rule 1.15, and Maryland Rules 19-407 and 19-408, the hearing judge did not evaluate those rules. Additionally, although Petitioner had not withdrawn its charge that Respondent also violated the MLRPC version of Rule 1.4(b), the hearing judge did not appear to make any finding as to whether Respondent violated that version of the rule.

## III.

### Standard of Review

"This Court has original and complete jurisdiction in attorney disciplinary proceedings and 'conducts an independent review of the record.' The hearing judge's findings of fact are left undisturbed unless those findings are clearly erroneous or either party successfully excepts to them." *Attorney Grievance Comm'n v. Ambe*, 466 Md. 270, 286 (2019) (citations omitted). "The hearing judge's factual findings are not clearly erroneous if they are supported by 'any competent material evidence.' We review the hearing judge's conclusions of law without deference." *Id.* (citations omitted).

## IV.

### Discussion

*Respondent's Exceptions*

Respondent makes five exceptions to the hearing judge's findings of fact and conclusions of law.

First, Respondent asserts that Bar Counsel failed to present any evidence, let alone clear and convincing evidence, that Respondent's clients lacked awareness of his use of the support staff at RT & Associates. Respondent argues that Petitioner did not provide any testimony or evidence in relation to any of Respondent's clients to establish that they lacked awareness of Respondent's relationship with RT & Associates or the role that the firm played in their representation. Respondent also points to the complaint filed by Jeron Morris, in which Morris clearly acknowledges that he understood that Tilghman was acting

as Respondent's paralegal. Therefore, Respondent contends that Petitioner has not satisfied its burden of establishing that Respondent violated Rule 1.4(b).

Respondent next argues that the wholesale repudiation of Respondent's outsourcing of paralegal services is unwarranted and not mandated by the rules of professional conduct. Respondent claims that the rules recognize that an attorney may contract with non-employees for the provision of certain services, and there is no requirement that such services be performed on site—as evidenced by the realities of the ongoing COVID-19 pandemic. Thus, there is nothing inherently suspect or improper with Respondent's engagement with RT & Associates as an independent contractor of paralegal services. Moreover, Respondent contends that most of the services that RT & Associates provided to his clients were appropriate, non-attorney functions, as recognized by this Court's prior caselaw. Therefore, Respondent argues that his violation of Rule 5.3 should be limited to those instances in which RT & Associates "settled cases with claims adjusters without [Respondent's] oversight."

Respondent further claims that despite his occasional supervisory shortcomings, he never condoned or believed that RT & Associates was engaging in the unauthorized practice of law. Bar Counsel stipulated that the staff at RT & Associates did not need a law license "in order to assist a supervising attorney in communicating terms of representation to clients, in client intake, or in the negotiation and/or settlement of personal injury cases." Additionally, Respondent finalized virtually all of the settlements himself. Respondent likens his employment of RT & Associates to the delegation of similar tasks

12

to in-house paralegals at high-volume personal injury firms, and he contends that personal injury cases often involve many routine tasks. Where more strategical considerations were involved or more legal experience necessitated, Respondent would step in. Therefore, Respondent excepts to the hearing judge's legal conclusion that he violated Rule 5.5.

Respondent next takes issue with the hearing judge's conclusion that he improperly shared fees with RT & Associates. He argues that his payments to RT & Associates reflected compensation for all of the work that the three to six employees of the firm conducted for him throughout the course of the given year, and that it is normal for such expenses to exceed the net income of any one attorney in the context of a high-volume personal injury practice. Respondent contends that a review of the payments made to RT & Associates does not reveal any express pattern of a percentage-based fee sharing practice, and that he appropriately categorized those payments as separate expenses on his tax returns. Respondent also argues that paying RT & Associates out of the earned attorney's fees in his trust account does not violate any ethical rules, as he is free to dispense with his earned fees as he sees fit. As such, Respondent excepts to the hearing judge's legal conclusion that he violated Rule 5.4.

Finally, Respondent asserts that Bar Counsel has failed to provide clear and convincing evidence of any occasion on which Respondent improperly commingled his funds with that of his clients. He contends that Bar Counsel bears the burden of providing evidence of specific transactions that would show the amounts of commingled funds, the period for which they were commingled, the frequency with which Respondent did so, and

13

that none of the exceptions to the applicable rules apply. According to Respondent, his candid admission that he did not always immediately withdraw all of his earned fees in order to ensure that any escrow checks would not bounce does not provide sufficient detail to establish his violation of Rule 1.15 or Maryland Rule 19-408.

With those exceptions in mind, we turn now to review the hearing judge's conclusions of law.

*Rule 1.1 Competence*

Rule 1.1 provides that an attorney "shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The hearing judge found that this was not a case of lack of competent representation and that Respondent had not violated Rule 1.1.

Pursuant to Maryland Rule 19-727(c), "Bar Counsel has the burden of proving the averments of the petition by clear and convincing evidence." Although Respondent admitted that RT & Associates was responsible for handling much of his clients' cases, including settlement in some instances, Petitioner did not put forth clear and convincing evidence of deficient representation. Petitioner did not show how any of the over 17,000 pages of case files that Respondent produced evidenced incompetent representation, and Petitioner did not call any witnesses to complain about the quality of the representation they received. Although Morris did file a complaint that included some allegations against Tilghman, for which Respondent could potentially bear responsibility, Morris did not

appear at the hearing, and that complaint was not offered or admitted at the hearing for the truth of its contents. Bar Counsel also did not take exception to the hearing judge's conclusion that Respondent did not violate Rule 1.1.

We therefore agree with the hearing judge that Bar Counsel has not met its burden of establishing that Respondent's conduct violated Rule 1.1.

*Rule 1.4(b) Communication*

Rule 1.4(b) provides that an attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." This rule "requires attorneys to communicate with their clients and keep their clients reasonably informed of the status of their case." *Attorney Grievance Comm'n v. Edwards*, 462 Md. 642, 699 (2019).

The hearing judge found that Respondent's lack of communication with clients, including Morris, and his failure to inform them that non-attorneys at RT & Associates were effectively in charge of their representation constituted a violation of Rule 1.4(b). To a large extent we agree with Respondent's exception to this alleged violation, in that there is a lack of evidence before us regarding specific communications or failures to communicate. There is also no evidence in the record regarding what Respondent's clients knew or did not know in relation to the role of RT & Associates with respect to their cases. It is true that the general pattern of representation described by Respondent during his statement under oath raises questions about the extent to which many of his clients may have made important decisions in their cases without Respondent's involvement and

15

counsel. However, Bar Counsel failed to find answers to those questions by providing clear and convincing evidence regarding specific decisions made by specific clients.

The only client for which Bar Counsel has presented relevant information regarding a representation is Jeron Morris. However, Morris's complaint shows that he understood that Tilghman was acting as Respondent's paralegal and was clearly aware that Tilghman was actively working on his case. The documents Respondent provided to Bar Counsel in response to Morris's complaint show that only preliminary steps were taken with respect to his case, including reaching out to the relevant insurance companies and informing them of Respondent's representation of Morris. In a letter sent to Bar Counsel during the investigation, Respondent explained that "[b]eyond clerical tasks, Mr. Tilghman conducted the initial intake for [Morris], arranged for his medical treatment, began to compile information, and prepared an application for PIP benefits to Erie Insurance Company." There is therefore no clear and convincing evidence that Morris made any decisions during Respondent's representation of him that would have required Respondent's prior explanation under Rule 1.4(b).

It is worth noting, however, that the letter sent to the other driver's insurance company, which is on Respondent's letterhead and is signed with his name, instructs the company to "contact my legal assistant, Ron Tilghman . . . to discuss settlement." The record does not indicate whether any settlement discussions took place with respect to Morris's claim during his representation by Respondent. However, such an approach to settlement would tend to be consistent with Respondent's admission during his statement

16

under oath that RT & Associates sometimes settled clients' claims without his involvement, and sometimes for clients of which he was not aware. Indeed, some of the documents that Respondent produced to Bar Counsel in relation to other clients similarly indicate that Tilghman should be contacted in relation to settlement discussions.

Resolution of a claim through settlement is a serious decision for a client, and one that clearly necessitates prior communication with an attorney under Rule 1.4(b). *Cf. Attorney Grievance Comm'n v. Planta*, 467 Md. 319, 349–50 (2020) (finding Rule 1.4(b) violations where the attorney, inter alia, failed to inform his client of settlement offers); *Attorney Grievance Comm'n v. Bocchino*, 435 Md. 505, 518 (2013) (finding a violation of Rule 1.4(b) where the attorney failed to inform his clients of the opposing party's requests for a settlement demand). Thus, to the extent that any of Respondent's clients settled their claims through Tilghman without prior discussion with Respondent, that would constitute a violation of Rule 1.4(b) on Respondent's part. The issue in this case, though, is that while Respondent has admitted that RT & Associates settled some clients' claims without his involvement during the relevant time frame, we do not know exactly when, or how many such claims were settled in this manner.

However, Respondent has admitted that RT & Associates settled clients' claims on multiple occasions without his involvement, and we will not overlook that misconduct

17

merely because we do not know the precise date or number of violations. Therefore, we conclude that on more than one occasion Respondent violated Rule 1.4(b).[8]

*Rule 5.3(a), (b), and (c) Responsibilities Regarding Non-Attorney Assistants*

Rule 5.3 provides in part:

With respect to a non-attorney employed or retained by or associated with an attorney:
(a) a partner, and an attorney who individually or together with other attorneys possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the attorney;
(b) an attorney having direct supervisory authority over the non-attorney shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the attorney;
(c) an attorney shall be responsible for conduct of such a person that would be a violation of the Maryland Attorneys' Rules of Professional Conduct if engaged in by an attorney if:
> (1) the attorney orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
> (2) the attorney is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action . . . .

The hearing judge found that Respondent's conduct violated each of these three subsections of Rule 5.3. According to the hearing judge, Respondent violated subsections (a) and (b) through the improper "delegation of broad authority to RT & Associates to act on his behalf with little or no supervision." The hearing judge further found that this

---

[8] Although we agree with much of Respondent's argument with respect to his exception on this point, we nevertheless overrule his ultimate conclusion that he did not violate Rule 1.4(b).

18

conduct violated subsection (c) because Respondent "knew or should have known that RT & Associates' unsupervised activities constituted the unauthorized practice of law."

As an initial matter, the hearing judge's analysis with respect to subsection (c) overlooks critical language included therein, namely, that the conduct of the non-attorney would constitute a violation of the rules of professional conduct if it were "engaged in by an attorney." The issue with the conduct of RT & Associates, as distinguished from that of Respondent, is whether RT & Associates was effectively engaging in activities that would either require supervision or a law license. If we assume, as the rubric of subsection (c) requires us to, that those activities were in fact engaged in not by RT & Associates, but by an attorney, then they would not constitute violations of the rules of professional conduct. Moreover, any of Respondent's actions or omissions in failing to properly supervise RT & Associates are not at issue under subsection (c), as distinguished from subsections (a) and (b). Therefore, regardless of whether Respondent may have violated subsections (a) and (b), the conduct of RT & Associates alleged in this proceeding would not violate the rules of professional conduct under subsection (c), and therefore Respondent has not violated subsection (c).

We turn now to whether Respondent's alleged lack of supervision of the paralegals at RT & Associates violated the other subsections of Rule 5.3. In *Attorney Grievance Commission v. Hallmon*, this Court explained the limited role that non-attorney assistants, such as paralegals, may properly perform:

> Law clerks and paralegals perform a variety of services for attorneys
> but they may not give legal advice, accept cases, set fees, appear in court,

19

plan strategy, make legal decisions, or "chart the direction of a case." . . . [U]nder the supervision of a licensed attorney, a legal assistant, for example, may obtain facts from the client, communicate information to the client, interview witnesses, "perform[ ] limited research to assist the lawyer with the legal analysis," obtain documents, obtain photographs, prepare summaries, prepare chronologies, prepare itemization of claims, prepare drafts of pleadings, prepare drafts of interrogatories and of production of document requests, prepare drafts of responses to discovery requests, prepare outlines for the lawyer to use in deposing a witness, index deposition transcripts, and prepare summaries of the evidence.

The key in all of these examples is supervision. The attorney may "not under any circumstance delegate to [a law clerk] the exercise of the lawyer's professional judgment [on] behalf of the client. . . ."

343 Md. 390, 400 (1996) (second and third alterations in original) (citations omitted).

As *Hallmon* explains, there are thus some activities that non-attorneys may never perform, such as appear in court or provide legal advice, and there are some activities that non-attorneys may only perform under the proper supervision of an attorney. In this case, although there is once again a lack of evidence regarding the actions that RT & Associates took with respect to specific clients, Respondent's admissions establish that he failed to properly supervise some of the actions of RT & Associates, and the staff there engaged in some actions that are impermissible for non-attorneys regardless of the level of supervision provided.

Respondent admitted that, on some occasions, RT & Associates settled claims for clients of which he had no knowledge. This establishes that the staff at RT & Associates was engaging in activity that required the close supervision of Respondent—to the extent they could engage in that activity at all—and Respondent failed to supervise them in

20

accordance with Rule 5.3(b).[9]  Based on his knowledge and acceptance of the conduct of

the staff at RT & Associates, Respondent also failed to "make reasonable efforts to ensure

that [his law firm had] in effect measures giving reasonable assurance that [RT &

Associates'] conduct [was] compatible with [his] professional obligations."  Rule 5.3(a).

We therefore conclude that Respondent violated Rule 5.3(a) and (b).[10]  *See Attorney*

*Grievance Comm'n v. Smith*, 443 Md. 351, 367–68 (2015) (finding that the attorney

violated Rule 5.3(a) and (b) where he delegated broad authority to his legal assistant to act

on his behalf with little supervision, including allowing her to "negotiate with insurance

companies and to obtain consent from clients to settle").

---

[9] It is possible that Respondent also failed to provide proper supervision with respect to other actions taken by RT & Associates.  However, Petitioner did not put forth clear and convincing evidence of specific actions taken by the staff at RT & Associates, and Respondent's corresponding lack of supervision.  We therefore limit our analysis to his lack of supervision over, and in some cases knowledge of, the settlement of claims by RT & Associates.  We need not have before us all of the details of such representations to conclude that it is misconduct for an attorney to allow a paralegal to settle a claim for a putative client of which the attorney is not aware, as Respondent admits occurred here.

[10] Our conclusion is not inconsistent with Respondent's exception on this point, which for the most part simply defended the general practice of outsourcing paralegal activities to off-site firms.  We do not here suggest that such outsourcing on its own constitutes a violation of Rule 5.3.  As long as an attorney provides proper oversight, such conduct does not violate the rule.  In his exception, Respondent suggests that his violation be limited to the instances in which RT & Associates "settled cases with claims adjusters without [Respondent's] oversight," which he candidly admits occurred and constitutes a violation of Rule 5.3.  We agree, and sustain Respondent's exception to that limited extent, without suggesting that all of the other conduct of the paralegals at RT & Associates was necessarily proper.

*Rule 5.4(a) Professional Independence of an Attorney*

Rule 5.4(a) provides, with certain exceptions not relevant here, that "[a]n attorney or law firm shall not share legal fees with a non-attorney." The hearing judge found that Respondent regularly violated this rule by paying RT & Associates a portion of the contingent attorney's fees from his clients' settlements. The hearing judge found that, as evidenced by the table Respondent provided, this practice took place from at least 2014 through the summer of 2018.

As the hearing judge found, that table, which was admitted at the hearing as Petitioner's Exhibit 17, shows that in nearly every case Respondent paid the majority of the total attorney's fees to RT & Associates. In fact, an independent review of that schedule shows that out of the approximately 800 total settlements, Respondent retained the majority of the attorney's fee in fewer than 3% of the cases.[11] Moreover, nearly 90% of the time RT & Associates was paid between 50 and 70% of the earned attorney's fee. In sum, out of all the attorney's fees Respondent earned during that five-year period, Respondent paid more than 63% of that amount to RT & Associates.

---

[11] The table that Respondent provided has several entries that are marked by asterisks. Often, those entries immediately follow an entry for a client with the same last name and show blanks under the Settlement Amount and Support Expense columns, listing only an Attorney's Fee amount. There is no explanation in the record as to what those asterisks represent or why those entries list only an Attorney's Fee. For purposes of our empirical analysis, we assume that those entries represent instances in which Respondent represented multiple clients as part of a single joint representation, and we consolidate the seemingly related entries as one settlement. However, even were our reading of the table in that regard to be misguided, our legal conclusions would remain the same.

As Respondent argues, paying a team of paralegals more than a single attorney might net in the attorney's own income does not on its own indicate improper fee sharing. It is also true, as Respondent contends, that there is no set percentage that he would pay to RT & Associates. However, that compensation should be closely tied to the value of the services provided. As RT & Associates never provided itemized invoices, there was no way of tracking exactly what services the staff at RT & Associates provided on each case or how many total hours they worked. Moreover, the only consistent predictor of the size of the payment made to RT & Associates is the amount of the attorney's fee. Respondent even admitted in a letter to Bar Counsel that the compensation paid to RT & Associates "often reflected, at least in part, the outcome of the case."

Thus, even if Respondent would also somehow take into account other factors, such as the nature of the case and how much work RT & Associates likely contributed, we cannot escape the conclusion that Respondent's payment structure with RT & Associates constituted improper fee sharing.[12] *See Attorney Grievance Comm'n v. Brennan*, 350 Md. 489, 501 (1998) (holding that it would be a violation of Rule 5.4 to share fees with a paralegal and noting that "any arrangement, salary or otherwise, based on, or calculated from the fees of clients or otherwise tantamount to a draw, would be equally impermissible as long as it suggested that the title of paralegal or clerk merely covered up what was, in

---

[12] While discussing payment to RT & Associates during his statement under oath, Respondent asked that Bar Counsel "please remember that I wasn't writing a check to Ron Tilghman, I was paying three to six people for all the work they were doing throughout the year." We have no reason to doubt the veracity of Respondent's statement in that regard, but the records he provided show that he was doing so by way of improper fee sharing.

substance, a continuation of the practice of law") (quoting *Attorney Grievance Comm'n v. James*, 340 Md. 318, 326 (1995)). Therefore, we find that Respondent routinely violated Rule 5.4(a) by sharing fees with RT & Associates, and we overrule Respondent's exception to this violation.

*Rule 5.5(a) Unauthorized Practice of Law*

Rule 5.5(a) provides that an attorney "shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." The hearing judge found that Respondent violated this rule by assisting RT & Associates in the unauthorized practice of law.

As discussed above, Respondent admitted that RT & Associates sometimes settled claims for clients of which Respondent was unaware. At least with respect to such clients, RT & Associates was effectively acting as their attorney, notwithstanding the fact that no one at RT & Associates was licensed to practice law. As Respondent was apparently aware of this practice and allowed it to continue, while RT & Associates was using his letterhead and sending correspondence bearing his signature without his awareness but with his authorization, Respondent was assisting the paralegals at RT & Associates in the unauthorized practice of law. *See Attorney Grievance Comm'n v. Barton*, 442 Md. 91, 104, 117 (2015) (finding that knowingly permitting a non-attorney to handle client intake and provide legal advice constituted assisting in the unauthorized practice of law); *Smith*, 443 Md. at 368 ("Permitting a non-lawyer assistant to send demand letters to insurance

24

companies, settle claims, and provide legal advice to clients without supervision constitutes assisting another in the unauthorized practice of law.") (citation omitted).

We acknowledge the points Respondent makes in taking exception to this alleged violation. However, they ultimately stand merely for the proposition that not *all* of Respondent's alleged supervisory shortcomings also constitute violations of Rule 5.5. That fact does nothing to excuse those instances in which the actions of the staff at RT & Associates rose to the level of unauthorized practice of law.[13] In his exception, Respondent also argues that he never believed that he was facilitating the unauthorized practice of law. Regardless of whether he believed he was, we find that Respondent was in fact assisting in the unauthorized practice of law, and we overrule his exception on that basis.

Once again, the record before us does not indicate how many times this took place, or the exact dates thereof. However, based on his own admissions, we find that on more than one occasion Respondent's conduct violated Rule 5.5(a).

We turn now to consider Respondent's actions and omissions in relation to his attorney trust account.

*Maryland Rule 19-407(a)(3), (a)(4), and (b) Attorney Trust Account Record-Keeping*

Maryland Rule 19-407 provides in part:

---

[13] As with our analysis of Respondent's violation of Rule 5.3, it is possible that other actions taken by RT & Associates also constituted the unauthorized practice of law. However, in the absence of any specific details of the paralegals' conduct and Respondent's corresponding supervision or lack thereof, Petitioner has failed to meet its burden with respect to such other conduct.

(a) Creation of Records.  The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

* * *

(3) Client Matter Records.  A record for each client matter in which the attorney receives funds in trust, as follows:

(A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended; (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) Record of Funds of the Attorney.  A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 19-408 (b).

(b) Monthly Reconciliation.  An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as permitted by Rule 19-408 (b), and the adjusted month-end financial institution statement balance.  The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

The hearing judge found that Respondent failed to keep the proper records in accordance with all of the above-listed subsections of Maryland Rule 19-407.  Specifically, he failed to keep client matter records or records of his own funds held in his attorney trust account pursuant to subsection (a).  He also failed to create monthly reconciliations in accordance with subsection (b).

Although Respondent claimed to have his own system of keeping track of the funds in his attorney trust account, he admits that he failed to create the proper records and

26

reconciliations in strict accordance with this rule during the relevant period. Therefore, we conclude that Respondent regularly violated Maryland Rule 19-407(a)(3), (a)(4), and (b) up through at least the initiation of Bar Counsel's investigation, if not longer.

*Maryland Rule 19-408 Commingling Funds*

Maryland Rule 19-408 provides:

(a) General Prohibition. An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 19-404 or permitted to be so deposited by section (b) of this Rule.
(b) Exceptions.
    (1) An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 19-411 (b)(1)(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.
    (2) An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.
    (3) Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

The hearing judge found that Respondent violated this rule when he admittedly left earned attorney's fees in his attorney trust account for "a period of days or weeks" after depositing client settlement proceeds and distributing the other portions of those proceeds.

27

Respondent explained that he did so in order to avoid allowing an escrow check to bounce. The parties also stipulated that there is "no evidence that any of Respondent's clients have suffered any loss of funds maintained in his attorney trust account or otherwise entrusted to him." However, a violation of Maryland Rule 19-408 is not triggered solely where clients suffer financial losses, and Respondent's reasoning for leaving his own funds in the trust account after he earned them does not fall within the rule's exceptions. Although Bar Counsel has not provided evidence of specific transactions, Respondent's own admissions sufficiently establish that he improperly commingled funds under the rule. *See Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 371 (2005) (finding that an attorney's failure to promptly remove earned fees from his trust account constitutes impermissible commingling under the pre-July 2016 versions of Maryland Rules 19-408 and 19-301.15(a)). Therefore, Respondent violated Maryland Rule 19-408, and we overrule his exception to this violation.

*Rule 1.15(a) and (b) Safekeeping Property*

Rule 1.15 provides in part:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with a representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.
(b) An attorney may deposit the attorney's own funds in a client trust account only as permitted by Rule 19-408 (b).

28

The hearing judge found that as Respondent violated Maryland Rules 19-407 and 19-408, that conduct also violated both cited subsections of this rule. For the reasons provided in the preceding two sections, we agree that Respondent violated Rule 1.15(a) and (b). Specifically, he did so by failing to keep proper trust account records or create the necessary monthly reconciliations in accordance with 19-407, and commingling his funds with his clients' funds in violation of 19-408 by failing to promptly remove earned attorney's fees from his trust account.

*Rule 8.4(a), (c), and (d) Misconduct*

Finally, Rule 8.4 provides in relevant part:

It is professional misconduct for an attorney to:
(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]
(d) engage in conduct that is prejudicial to the administration of justice . . . .

The hearing judge found that Respondent violated subsections (a) and (d) of this rule. First, as the hearing judge found various other rules violations, Respondent also violated Rule 8.4(a). Second, the hearing judge found that when viewed as a whole, Respondent's conduct negatively impacted the public's perception of the legal profession, thereby violating 8.4(d). However, the hearing judge found that Bar Counsel had failed to establish that Respondent violated Rule 8.4(c), as there was not clear and convincing

29

evidence that Respondent made knowing false statements or misrepresentations, or intended to deceive anyone.

We of course agree with the hearing judge that Respondent's various violations of the rules of professional conduct, detailed above, also compel the conclusion that he violated Rule 8.4(a). *E.g.*, *Attorney Grievance Comm'n v. Cherry–Mahoi*, 388 Md. 124, 159 (2005) ("Because we have held that Respondent has violated several Rules of Professional Conduct, she necessarily violated Rule 8.4(a) as well . . . ."). We further agree that Petitioner has failed to establish that Respondent acted fraudulently or dishonestly or made any misrepresentations. The record is devoid of any evidence that Respondent misled his clients regarding the nature of RT & Associates' involvement in their cases or any of the other misconduct outlined here. Therefore, we find that Petitioner did not meet its burden of establishing that Respondent violated Rule 8.4(c).

Under Rule 8.4(d), this Court has explained that a wide range of conduct can be prejudicial to the administration of justice. *See Attorney Grievance Comm'n v. Rand*, 411 Md. 83, 96 (2009). "In general, an attorney violates [Rule] 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Id.* In *Smith*, we concluded that an attorney's conduct met this standard where the attorney, among other things, commingled personal and client funds in a trust account and failed to keep adequate trust account records. 443 Md. at 377. The Court also found that Smith "virtual[ly] abandon[ed]" his law practice "to the charge of his non-lawyer assistant, with little or no supervision, to such an extent that [the assistant] engaged in the unauthorized

practice of law and was able to misappropriate client monies for almost four years." *Id.*

Respondent similarly mismanaged his trust account and, at least in relation to those clients

for which RT & Associates handled the entire case up through settlement, failed to

adequately supervise his paralegal assistants and allowed them to engage in the

unauthorized practice of law. Therefore, we agree with the hearing judge that

Respondent's conduct negatively impacts the public's perception of the legal profession,

and that Respondent therefore violated Rule 8.4(d).

## V.

### Aggravating and Mitigating Factors

In determining the proper sanction, this Court considers not only the nature of the

underlying conduct, but also the presence of both aggravating and mitigating factors. *E.g.*,

*Attorney Grievance Comm'n v. Johnson*, 462 Md. 422, 432–33 (2019). We recognize the

following aggravating factors:

(1) prior attorney discipline;
(2) a dishonest or selfish motive;
(3) a pattern of misconduct;
(4) multiple violations of the [rules of professional conduct];
(5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge;
(6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding;
(7) a refusal to acknowledge the misconduct's wrongful nature;
(8) the victim's vulnerability;
(9) substantial experience in the practice of law;
(10) indifference to making restitution or rectifying the misconduct's consequences;
(11) illegal conduct, including that involving the use of controlled substances; and

(12) likelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 275 (2018) (citation omitted) (reformatted). "Bar Counsel has the burden of proving the existence of aggravating factors by clear and convincing evidence." *Attorney Grievance Comm'n v. Bah*, 468 Md. 179, 215 (2020) (citation omitted).

The hearing judge found by clear and convincing evidence that the fourth and ninth factors applied, as Respondent committed multiple offenses and had substantial experience in the practice of law at the time of his misconduct, having practiced in Maryland for nearly fifty years. We agree, and further find that the third factor applies. Respondent has admitted that much of the conduct underlying his violations constituted his routine business practices, including with respect to fee sharing and his mismanagement of his trust account, establishing that Respondent has also engaged in a "pattern of misconduct." *See Sperling*, 459 Md. at 276 ("Factor 3, a pattern of misconduct, applies when an attorney's behavior shows a pattern of inappropriate conduct, as evinced by multiple violations over time, or a series of acts with one goal."). This is especially true with respect to the improper fee sharing with RT & Associates, for which we have not only Respondent's own admissions, but also documentary evidence establishing the pattern over the course of five years.

This Court also recognizes the following mitigating factors:

(1) the absence of prior attorney discipline;
(2) the absence of a dishonest or selfish motive;
(3) personal or emotional problems;
(4) timely good faith efforts to make restitution or to rectify the misconduct's consequences;

32

(5) full and free disclosure to Bar Counsel or a cooperative attitude toward the attorney discipline proceeding;
(6) inexperience in the practice of law;
(7) character or reputation;
(8) a physical disability;
(9) a mental disability or chemical dependency, including alcoholism or drug abuse, where:
> (a) there is medical evidence that the [attorney] is affected by a chemical dependency or mental disability;
> (b) the chemical dependency or mental disability caused the misconduct;
> (c) the [attorney's] recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
> (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely;
(10) delay in the attorney discipline proceeding;
(11) the imposition of other penalties or sanctions;
(12) remorse;
(13) remoteness of prior violations of the [rules of professional conduct]; and
(14) unlikelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Slate*, 457 Md. 610, 647 (2018) (reformatted). "The respondent in an attorney disciplinary proceeding must prove the presence of mitigating circumstances by a preponderance of the evidence." *Bah*, 468 Md. at 215 (citation omitted).

The hearing judge found by a preponderance of the evidence that seven of those factors applied. First, Respondent has had a long and unblemished career with no prior disciplinary record. Second, there was no evidence that Respondent acted selfishly or with a dishonest motive. Instead, the evidence showed that Respondent is an honest man but, as he has admitted and is evidenced by his tax forms, he was "a better lawyer than . . . a businessman." Third, Respondent engaged in full and free disclosure to Bar Counsel

33

during the investigation, responding "in a timely manner to all requests for information by the Office of Bar Counsel" and producing "in excess of 17,000 pages of documents during the course of this investigation." The hearing judge also found that Respondent displayed a cooperative attitude toward the proceedings. Fourth, Respondent has engaged in good faith efforts to rectify his misconduct by discontinuing the outsourcing of his paralegal services and cutting back on the volume of his practice.

Fifth, based on the testimony of Respondent's three character witnesses, Respondent "enjoys an excellent reputation for good character" among members of the bench and bar, along with his own clientele. Sixth, the hearing judge found that Respondent accepts complete responsibility for his shortcomings and is "credibly remorseful" for his actions. And finally, Respondent has been working with the counsel representing him in this proceeding and an accountant to improve upon the practices that form the foundation of his violations. Indeed, Respondent asserted during the hearing that he and his counsel "have spent as much time on ways to improve my practices as we have in trying to defend them." As Respondent is committed to improving his practices in the future, the hearing judge found that it was unlikely that he would repeat his misconduct going forward. For all of the reasons provided by the hearing judge, this Court agrees and finds that those seven mitigating factors apply in this case.

## The Sanction

We must now determine the appropriate sanction for Respondent's ethical violations, in light of the mitigating and aggravating factors identified above. "In fashioning the appropriate sanction to be imposed, we are guided by our interest in protecting the public and the public's confidence in the legal profession." *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 595 (2005) (citation omitted). "As we have often stated, the purpose of attorney disciplinary proceedings is not to punish the [attorney], but to protect the public as well as to deter other [attorneys] from engaging in similar misconduct." *Id.* at 596 (citation omitted). "When determining the appropriate discipline, we consider the facts and circumstances of each case and order a sanction that is 'commensurate with the nature and gravity of the violations and the intent with which they were committed.'" *Edwards*, 462 Md. at 712 (citation omitted).

We begin our analysis of the proper sanction in this case by noting once again that the record before us is insufficient to support many of the allegations Bar Counsel made in the Petition for Disciplinary or Remedial Action. Though we are troubled by the specter that we may not appreciate the full scope of Respondent's potential misconduct, that uncertainty appears to be no fault of Respondent. By all accounts, including that of Bar Counsel, Respondent has been both cooperative and forthcoming during the course of this investigation, submitting over 17,000 pages of requested documents and answering every question propounded of him. Rather, the deficiency of the record appears to be owing to

35

the failure to elicit all of the requisite details. We shall therefore strictly limit, as we must, our consideration of Respondent's misconduct to that as we have found proven, as outlined above, and tailor the sanction accordingly.

Petitioner asserts that the proper sanction in this case is an indefinite suspension. Petitioner relies first on *Barton*, in which this Court indefinitely suspended an attorney, inter alia, for failing to supervise a non-attorney employed in her office and allowing that employee to engage in the unauthorized practice of law. 442 Md. at 139–40, 149–50.

Respondent argues that unlike in this case, Ms. Barton, whose conduct prompted three petitions for disciplinary action, gave her office manager, Mr. Tolbert, "total control of the firm bank accounts" and "continued to provide 'blank' checks to Mr. Tolbert for several months after she had learned that Mr. Tolbert had stolen money from the firm." *Barton*, 442 Md. at 96, 102, 106, 117. Barton also refused to return unearned fees to clients, failed to keep clients' fees in an attorney trust account, and did not disclose fees she had received to the Bankruptcy Court, as required. *Id.* at 117–18. She also did not properly communicate with her clients and failed to provide competent representation to nine of her bankruptcy clients, to their detriment. *Id.* at 115–16, 146. Furthermore, the Court found that Barton "embodied a dishonest and selfish motive, engaged in a pattern of misconduct, committed multiple offenses, refused to acknowledge the wrongful nature of her conduct and has shown no effort to make restitution, despite a court order to do so." *Id.* at 145. After finding only two mitigating factors, the Court indefinitely suspended Barton. *Id.* at 147–50.

36

We agree with Respondent that although some of Respondent's misconduct was similar in nature to that of Barton, that case is distinguishable in that Barton engaged in a "bevy" of rule violations not applicable here and had many more aggravating factors and fewer mitigating ones. *Id.* at 148. Therefore, *Barton* does not compel us to issue an indefinite suspension in this case.

Respondent directs us instead to other cases involving attorneys who failed to supervise employees and assisted in the unauthorized practice of law in which we issued definite suspensions where the circumstances so warranted. In *Brennan*, we suspended the attorney for ninety days for assisting a suspended lawyer to engage in the unauthorized practice of law. 350 Md. at 501–02. There, Brennan had gone into practice with James, the suspended attorney, purportedly acting as his supervising attorney while James claimed to be acting as a law clerk or a paralegal. *Id.* at 492. However, James "continued to draft legal documents, negotiate on behalf of clients, and even sign legal documents." *Id.* (citation omitted). Therefore, it could appear to the public that the suspended attorney was still holding himself out as a practicing attorney, and thus was engaging in the unauthorized practice of law. *Id.* With respect to one matter, the clients believed that James was their attorney and that Brennan was just his assistant, who might not have even been an attorney. *See id.* at 493–94. The clients paid James for the representation, and he split that fee with Brennan. *Id.* During that representation, Brennan also failed to appear at a hearing and was unavailable to the clients thereafter. *Id.* at 494. We nonetheless determined that a ninety-day suspension was the proper sanction. *Id.* at 502.

37

In *Attorney Grievance Commission v. Dore*, we considered an attorney who did not properly supervise his employees. 433 Md. 685 (2013). The employees were regularly signing his name on affidavits in foreclosure actions on his behalf, which he had authorized them to do, but then also notarizing the false signatures. *Id.* at 689. Once Dore learned that his employees were notarizing the signatures, he banned the practice of signing on his behalf, instituted a new procedure, and spent significant time and expense to correct the falsified notarizations. *Id.* at 693–94. The Court also found similar mitigating factors to those that we have found here and determined that a ninety-day suspension was appropriate. *Id.* at 720, 727. Important for our present purposes, we stated in *Dore* that we "refrain[ed] from an indefinite suspension only because of the many mitigating circumstances." *Id.* at 727.

In *Attorney Grievance Commission v. Harris-Smith*, we issued a thirty-day suspension to an attorney who engaged in the unauthorized practice of law and failed to supervise one of her employees, among other violations. 356 Md. 72 (1999). Although Harris-Smith was licensed to practice in Pennsylvania, Virginia, and the District of Columbia, she was not barred in Maryland, though she was admitted to the United States District Court for the District of Maryland. *Id.* at 74. Harris-Smith limited her practice exclusively to bankruptcy matters. *Id.* She practiced as a named principal at a firm in Maryland that ran advertisements suggesting that their attorneys were experienced in dealing with foreclosures, personal injury claims, employment law, and bankruptcy. *Id.* at 74–76. Other advertisements indicated solely that potential clients should reach out if they

were being threatened with foreclosure and made no mention of bankruptcy law. *Id.* at 76. The advertisement in the classified telephone directory listed the following under her name: "Specializing in Bankruptcy—Real Estate & Personal Injury." *Id.*

Harris-Smith's business card listed the firm's Maryland address, but did not indicate that she was not licensed to practice in Maryland. *Id.* at 77. She also performed the initial intake meeting with most clients, referring non-bankruptcy clients to other attorneys at the firm. *Id.* We ultimately affirmed the hearing judge's conclusion that although Harris-Smith never made direct misrepresentations to clients, she improperly held herself out as licensed to practice in Maryland and failed to disclose that her practice was limited to bankruptcy. *See id.* at 78. Relying in part on the fact that the violations were unlikely to continue, as the firm had since dissolved and Harris-Smith had moved her practice to the District of Columbia, we determined that a thirty-day suspension was the appropriate sanction. *Id.* at 90–92.

Finally, in *Hallmon* we issued a ninety-day suspension to an attorney who: (1) assisted an unlicensed law school graduate in the unauthorized practice of law by failing to adequately supervise her, (2) failed to maintain an escrow account, and (3) failed to respond to Bar Counsel. 343 Md. at 393, 394, 396–97, 401–09. We also required that the termination of Hallmon's suspension be subject to his satisfaction of certain conditions, including that he complete courses on the rules of professional conduct and law office management, and that he engage a monitor to oversee his practice. *Id.* at 410–11.

39

We find that Respondent's misconduct relating to his failure to properly supervise RT & Associates, his assistance in their engaging in the unauthorized practice of law, and his sharing of fees warrants a sanction more akin to those we issued in *Brennan*, *Dore*, *Harris-Smith*, and *Hallmon*, as opposed to the indefinite suspension we issued in *Barton*.

Petitioner also cites to cases in which this Court has issued indefinite suspensions to attorneys who have mishandled their trust accounts. *See Attorney Grievance Comm'n v. Mahone*, 451 Md. 25, 43, 49 (2016); *Attorney Grievance Comm'n v. Bell*, 432 Md. 542, 557, 564 (2013). In *Mahone*, the attorney failed to keep the proper trust account records, deposited earned attorney's fees into the account, created negative balances in accounts belonging to at least four clients, used funds in the account for unauthorized purposes, and withdrew $1,500 in cash from the account. 451 Md. at 38–39. Mahone also failed to fully cooperate with Bar Counsel during his investigation and had been sanctioned by this Court on three previous occasions, one of which involved similar misconduct. *Id.* at 38, 48. Here, by contrast, there is no indication that Respondent improperly used funds in his trust account or mishandled his clients' accounts. He has also cooperated with Bar Counsel in this investigation and has no history of discipline.

In *Bell*, the attorney regularly made personal payments out of his trust account, deposited and stored attorney's fees in the account, wrote forty-five checks to cash out of the account, took unearned fees from the account, over-drafted the account on one occasion, and failed to maintain the proper records. *Bell*, 432 Md. at 551–53, 557. After considering Bell's multiple offenses, and his prior reprimand for violating Rule 8.4(a) by

40

attempting to obtain an unreasonable fee from a client, the Court determined that an indefinite suspension with the right to reapply after thirty days was appropriate. *Id.* at 560, 564.

Although we do not in any way condone Respondent's actions in failing to maintain the proper records and reconciliations and failing to promptly remove earned attorney's fees from his trust account, there is no indication that he was using it as a personal account, that he was taking fees that he was not entitled to, or that he ever over-drafted the account. In fact, he claims that his intention in leaving his fees in the account was to avoid such a situation. The rules of professional conduct do not allow for this practice, but Respondent's violations are not as severe as those in *Bell* and *Mahone*, and Respondent has no prior disciplinary record during his nearly fifty-year career.

Critical to this case is the fact that the record does not show that Respondent acted with bad intent, dishonesty, or to further his own personal interests. *See Bell*, 432 Md. at 559 ("Although ignorance does not excuse a violation of disciplinary rules, a finding with respect to the intent with which a violation was committed is relevant on the issue of the appropriate sanction.") (quoting *Attorney Grievance Comm'n v. Obi*, 393 Md. 643, 658 (2006)). Furthermore, Bar Counsel has not presented evidence that any of Respondent's clients suffered financial losses or other concrete prejudice to their claims on account of Respondent's conduct.[14] Therefore, we find that Respondent's conduct is more akin to

---

[14] We do recognize, though, that not receiving the proper representation and counsel from an attorney during the settlement process is a harm in and of itself.

41

cases in which we have issued definite suspensions. For example, in *Attorney Grievance Commission v. Goldberg*, the attorney delegated responsibilities to his secretary and she, without his knowledge, failed to take certain actions on behalf of clients, including failing to file pleadings and causing clients' accounts to have negative balances. 292 Md. 650, 651–53, 656 (1982). We issued a thirty-day suspension, relying in part on the fact that there was no financial harm to the clients and the attorney had "overhauled his office" since learning of the misconduct. *Id.* at 658.

In *Attorney Grievance Commission v. Sapero*, we considered an attorney who delegated management of his escrow account to his employees, which resulted in earned attorney's fees being left in the account on several occasions between 1991 and 2005. 400 Md. 461, 466 (2007). He also failed to maintain proper trust account records, failed to adequately communicate with a client, and did not promptly produce records to Bar Counsel. *Id.* at 467, 469, 490. However, we found that Sapero's misconduct "was determined to be neither detrimental to his clients, nor intentional or motivated by fraud." *Id.* at 490. We further found that his lack of communication "did not result in any injury to [his clients], and commingling of his funds with those of his clients did not result in any misappropriation of client funds." *Id.* After finding similar mitigating factors to those applicable here, including that Sapero's misconduct was not willful, he was remorseful, he had taken extensive remedial action such that the violations were unlikely to recur, and he had no history of discipline, we determined that a reprimand was the appropriate sanction. *Id.* at 489–91.

Respondent also urges this Court to consider his cooperation in these proceedings and the unlikelihood that he will repeat this misconduct as key factors in determining the appropriate sanction. We agree and find that those factors are important in distinguishing this case from others in which we have issued a more severe sanction, such as indefinite suspension. This Court has recently explained that an indefinite suspension is an "extreme" sanction, "one of the strongest we may order against an attorney." *Attorney Grievance Comm'n v. Milton*, 467 Md. 433, 461 (2020). We are not persuaded that such a sanction is warranted in this case. Rather, we are convinced that a definite suspension, in conjunction with the requirement that Respondent establish thereafter that he is competent to practice law in accordance with Maryland Rule 19-752 (criteria for reinstatement when an attorney is suspended for more than six months), will serve the interests of these proceedings.

Therefore, we suspend Respondent for a period of six months and one day, commencing thirty days after the date on which this opinion is filed, after which he may petition this Court for his reinstatement. Should he be successful, Respondent's reinstatement shall be further conditioned on his engagement of an attorney monitor for an additional three months following the date of his reinstatement in order to ensure that he practices in accordance with all applicable rules and regulations. The monitor must be acceptable to Bar Counsel and shall be engaged at Respondent's expense.

**IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL**

43

**TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CHARLES ALLAN FINEBLUM.**